# Appendix A

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3    _____
                                            )
 4    ASTRAZENECA AB, AKTIEBOLAGET          )
      HASSLE, KBI-E INC., KBI INC.,         )
 5    and ASTRAZENECA, LP,                  )
                                            )
 6              Plaintiffs,                 )
                                            )Civil Action No.
 7          vs.                             )01-CIV-9351 (DLC)
                                            )
 8    APOTEX CORP., APOTEX, INC. and        )
      TORPHARM, INC.,                       )
 9                                          )
                Defendant.                  )
10    _____)
                                            ) Civil Action No.
11    In re OMEPRAZOLE PATENT LITIGATION)    M-21-81 (DLC)
                                            ) MDL Docket
12    _____) No. 1291

13

14          VIDEOTAPED DEPOSITION OF EXPERT

15            GORDON C. RAUSSER, Ph.D.

16            Emeryville, California

17             Friday, August 9, 2013

18                   Volume I

19

20       CONFIDENTIAL - PURSUANT TO COURT ORDER

21

22    Reported by:
      ANA M. DUB, RPR, RMR, CRR, CCRR, CLR
23    CSR No. 7445

24    Job No. 15216

25    (Pages 1 - 220)
```

Page 14

1    A.  No.
2    Q.  Did you speak with any AstraZeneca
3  employees while preparing your report or preparing
4  to be deposed?
5    A.  No, with regard to being deposed.  Yes,
6  with regard to speaking to other officers of
7  AstraZeneca in the prior engagement.
8    Q.  What -- so, I'm sorry.  Let me rephrase
9  that.
10      You say that you spoke with AstraZeneca
11  employees while preparing your previous
12  declarations.  What topics did you discuss with
13  them?
14    A.  Their -- largely, much of the discussion
15  went to some of the documents produced in the normal
16  course of business, the interpretation of those
17  documents.  There was also general discussion in a
18  meeting involving a number of AstraZeneca people on
19  their rebating strategies with regard to managed
20  care.
21    Q.  And do you remember who you spoke with?
22    A.  No.
23    Q.  Did you review any internal AstraZeneca
24  documents while preparing these declarations?  When
25  I say "these," I mean in this -- in the instant

Page 15

1  case.
2    A.  Whoops.  I'm sorry.  It's -- your question
3  is difficult to sort out.  I mean, I've reviewed a
4  lot of documents.  And you said "in preparing."
5  I've reviewed them either before and/or after
6  preparing the actual declarations.
7      (Mr. Quies leaves the proceedings.)
8      THE WITNESS:  Thank you.  Thank you.
9  Jenny should be the responsible person.  She cleans
10  up all my messes.
11      MR. ANDERSON:  It's good to have those
12  people around.
13      MS. KINBURN:  Speaking of your
14  declarations . . .
15      (Mr. Quies joins the proceedings.)
16      THE WITNESS:  Thank you very much.
17      MS. KINBURN:  They are, of course,
18  voluminous.  I'd like to mark -- this will be
19  Exhibit 1.
20      (Whereupon, Deposition Exhibit 1 was
21  marked for identification.)
22      MS. KINBURN:  And then Dr. Rausser's
23  supplemental declaration will be Exhibit 2, for
24  completeness's sake.
25

Page 16

1      (Whereupon, Deposition Exhibit 2 was
2  marked for identification.)
3  BY MS. KINBURN:
4    Q.  Dr. Rausser, does that appear to be your
5  declaration in this matter?
6    A.  Yes.
7    Q.  If you could please take a look at the
8  last page of your declaration, this is Exhibit C,
9  "Materials Reviewed and Relied On."
10    A.  Yes.
11    Q.  Do you see any internal AstraZeneca
12  documents, or can you point them out to me, that you
13  relied on in preparing your declaration?
14    A.  Certainly.  The AstraZeneca rebate data
15  for both Nexium and Prilosec are all internal
16  AstraZeneca documents.
17      In addition to those documents, others
18  that I have reviewed and evaluated are documents
19  that have been produced by the defendant experts.
20  And along with that, I think I cited at the
21  beginning of my declaration my prior report and all
22  the documents that I relied upon in my prior report,
23  which has been produced to you, as I understand it.
24    Q.  So you rely not only on the documents
25  cited in your Exhibit C here, but anything cited in

Page 17

1  your previous declaration?
2    A.  Yes.
3    Q.  Can you tell me what academic experience
4  you have with regard to the pharmaceutical industry?
5    A.  Certainly.  Academic experience or just
6  experience?
7    Q.  Let's start --
8    A.  You're making a --
9    Q.  -- academic.
10    A.  You're making a separation between the
11  two?
12    Q.  If possible.
13    A.  Certainly.  While on the faculty of
14  Harvard University, I orchestrated a major case on
15  the pharmaceutical industry.  And there was a
16  complete evaluation of market dynamics, looking at
17  the effect of entry, patent expiration, and the
18  pricing and marketing and promotion strategies.
19      This was done as a case study, and it
20  subsequently became a case that was taught in a
21  second-year M.B.A. course that looked at competition
22  in markets and strategies used by various companies,
23  particularly in markets that were not characterized
24  as perfectly competitive markets.
25      Subsequently, I have done work on --

Page 18

1  academic work on patents and specifically looked at
2  questions related to R&D, search, and the effect of
3  those kinds of actions on discovery and whether, in
4  fact, the discoveries result in codified
5  intellectual property that has some inherent value.
6        And then along the way there's been
7  various Ph.D. students who I've provided
8  mentorship -- mentorship, responsibility as the
9  chairman on their dissertation committees, in which
10  they've looked at various questions that relate,
11  once again, to market structure, pricing dynamics,
12  strategies that companies sometimes use under the
13  Hatch-Waxman rules of entry and patent expiration.
14     Q.  Okay.  Can you tell me what other
15  experience you have in the pharmaceutical industry?
16     A.  Now we're beyond academic experience?
17     Q.  Yes.
18     A.  Yes.  Over the course of the last 20-plus
19  years, beginning in, I guess, 1992 when I was
20  engaged as the joint defense expert, this was a case
21  that went on for 12 years.  Well, the original case
22  was a class case, but then there were subsequent
23  opt-out plaintiffs that I was an economic expert
24  evaluating damages.
25     Q.  And which case was that?

Page 19

1     A.  The branded -- Brand Name Antitrust
2  Litigation.
3        In that particular case, I got access to
4  all the proprietary data of the defendants and also
5  was completely educated with respect to the managed
6  care channel and pharmaceutical manufacturers'
7  strategy with regard to moving volume, trying to
8  create incentives for moving more volume through the
9  market.
10        Actually went, on a few occasions, to
11  witness and observe the actual negotiations between
12  some managed care and/or PBMs with regard to setting
13  the conditions with regard to different levels of
14  rebates, depending on the volume that was moved by
15  that specific entity.
16     Q.  Why don't I stop you there just so --
17     A.  No.  I want to complete my response.  You
18  asked me the question.  Let me complete the response
19  to the question.
20        Following that particular work, I've been
21  engaged on at least 40 times, maybe as many as 50
22  times, to evaluate patent infringement, patent
23  validity, commercial success, FDA approval.  I've
24  helped in a couple of instances with respect to the
25  design of clinical trials.  And I've also been

Page 20

1  engaged as a consultant, helping with regard to the
2  launch of some new products with regard to pricing,
3  marketing and promotion.
4     Q.  Okay.  To go back to what I was going to
5  ask, when you were . . .
6        I'm sorry.  You said that you, on a few
7  negotiations, witnessed and observed negotiations
8  between managed care and/or PBMs.  Can you define
9  "managed care and/or PBMs"?
10     A.  Certainly, I think Mr. Navarro has already
11  done that for you in this litigation.  He has
12  provided a complete description of the institutional
13  structure.
14        And what PBMs, pharmacy benefit managers,
15  they actually serve a role as agents for a
16  third-party payer with regard to managing the
17  trade-off between cost and efficacy of different
18  therapies that are available on the marketplace for
19  their responsible covered lives.
20        Managed care generally refers to that
21  channel in which there is active involvement with
22  regard to designing formularies, using formularies
23  to manage both the cost and the prescriptions that
24  are written by physicians; sometimes simply
25  influencing them, in other cases controlling what

Page 21

1  physicians actually write with regard to
2  prescriptions.
3     Q.  So those negotiations, were they between
4  managed care and PBMs or were they between those two
5  entities and brand-name drug manufacturers?
6     A.  The latter.
7     Q.  So you mentioned that that related to --
8  that those negotiations related to formulary status
9  in some extent.
10        What other experience do you have with
11  regard to formularies in the pharmaceutical
12  industry?
13     A.  I've certainly reviewed formularies.  I've
14  reviewed the standard scorekeeper with respect to
15  data that is available on formulary status and how
16  those formularies change with regard to maybe its
17  inherent structure but, also, where a brand drug
18  versus a generic drug sits on the formularies, what
19  the co-pays are for different tiers, whether -- I've
20  also seen the actual contracts.
21        I've reviewed P&T committees with regard
22  to their assessment of the efficacy of various
23  therapies and whether a particular therapy, its
24  incremental effectiveness is justified by whatever
25  cost of that therapy.  I have on a couple of

ASTRAZENECA AB vs. APOTEX
Gordon Rausser Confidential

Job 15216
Pages 54..57

Page 54

1    Q.   Just to clarify, this
2  cross-pricing elas- -- cross-price elas- --
3    A.   Elasticity.
4    Q.   Elasticity.  Thank you.
5         Is the substitutability that you're
6  speaking of the substitution that a doctor might
7  prescribe, that a patient would ask for, or that a
8  third-party payer would consider?  I'm just not sure
9  where the substitution that you're speaking of comes
10  into play.
11    A.   All of those factors play a role in the
12  degree of substitutability.
13        With regard to the third-party payer, what
14  influence or control do they have on prescribing
15  physicians' behavior?  That's certainly an important
16  part of determining the degree of substitutability,
17  and formularies play a role in that respect.
18        If a formulary has some incentives by
19  putting one of the PPIs at a more favorable tier
20  with a lower co-pay, that's certainly going to
21  affect the substitutability among the PPIs.
22        The prescribing doctors certainly have
23  some influence over the degree of substitutability.
24  And ultimately, the patients do as well because if
25  there's a particular therapy among the PPIs that

Page 55

1  works very well, it's very likely that they're going
2  to be sticky and continue to use that particular
3  therapy.
4         As I indicated with the positioning of
5  AstraZeneca with regard to Prilosec and the OTC
6  version of that, that's an instance where they're
7  trying to actually assist the consuming population
8  with regard to the substitutability.
9         All of those factors play a role.
10    Q.   How does that play into a third-party
11  payer's decisions with regard to formulary status?
12    A.   Formulary status, as I indicated earlier
13  today, if you look at the actual economic interest
14  of the third-party payer, it is to balance the
15  trade-off between cost and efficacy.  So cost, in
16  turn, is going to be influenced by the rebates that
17  are offered by the manufacturer.
18         And if it turns out based on their P&T
19  committees or their assessment, the incremental
20  efficacy, say, of Nexium vis-a-vis Prilosec, that
21  may give them a favorable perspective on where
22  Nexium should be placed on the formulary.  But
23  that's only one dimension that they look at.
24         The other dimension is:  What is the cost?
25  That cost can be directly influenced by the amount

Page 56

1  of rebates that are offered by AstraZeneca.
2    Q.   A third-party payer who's making decisions
3  about their formulary with regard to PPIs would look
4  at the efficacy of the various brands or generics?
5    A.   Mm-hmm.
6    Q.   And then the cost to them, presumably
7  after rebates; is that correct?
8    A.   That is correct.
9         MS. KINBURN:  I'm going to mark as
10  Exhibit 5 -- thank you -- Exhibit 6 AZD 166749.
11         (Whereupon, Deposition Exhibit 6 was
12  marked for identification.)
13  BY MS. KINBURN:
14    Q.   Dr. Rausser, have you seen this document
15  before?
16    A.   Yes.
17    Q.   And just for the record, this is a Nexium
18  SCO brainstorming meeting from August 3rd, 2004.
19    A.   Yes.
20    Q.   If you could take a look at page 11, this
21  is a slide that is headed "The PPI market is
22  extremely price competitive."  And it's a chart
23  setting forward the current WAC with deepest rebate
24  in HMO/PBM segment for various PPIs; is that
25  correct?

Page 57

1    A.   Yes.
2    Q.   And when you look at this chart, do you
3  notice that it has, as described in the title, two
4  prices for each of these PPIs?
5         The current WAC, which is the weighted
6  average cost; is that correct?
7    A.   Yes, that's the title.
8    Q.   Okay.  So it shows the current WAC and
9  then also the deepest rebate that each of these PPIs
10  is offering in the HMO/PBM segment.
11         So would -- when you review this chart,
12  does this comport with your understanding of the
13  market for PPIs?
14         MR. ANDERSON:  You're talking about as of
15  the date of this chart?
16         MS. KINBURN:  Yes.
17         THE WITNESS:  No.  It's very imprecise and
18  very misleading.
19  BY MS. KINBURN:
20    Q.   Okay.  Please explain how it's imprecise
21  and misleading.
22    A.   First of all, look at omeprazole.  First
23  of all, it's not for the entire market.  That's only
24  for mail order.  There are no rebates that I've been
25  able to discover, as I point out in my report, as --

Page 58

1  in which there is any rebates offered, aside from
2  mail order, for omeprazole.  So this is a very
3  misleading chart in that respect.  That's the first
4  response.
5      The second response, "deepest," that means
6  nothing.  It means nothing whatsoever.  If there is
7  one instance, one transaction where a particular
8  rebate is offered to mail order with regard to a PPM
9  and it's one instance in which they're attempting to
10 move some additional volume, excess inventory or
11 whatever, is it systematic?  That's the fundamental
12 question.  None of these deepest rebates represent
13 market conditions.
14     So my answer to your question, this is a
15 very misleading chart that has no foundation for any
16 inferences.
17     MS. KINBURN:  I'm going to mark as
18 Exhibit 7 a document marked AZD 185338.
19     (Whereupon, Deposition Exhibit 7 was
20 marked for identification.)
21     THE WITNESS:  Is there a question?
22 BY MS. KINBURN:
23     Q.  Yes.  So just to identify the document,
24 this is a primary care - GI third quarter 2003
25 performance review dated October 3rd, 2003.  Is that

Page 59

1  correct?
2      A.  It is.
3      Q.  And this is an AstraZeneca internal
4  document?
5      A.  Yes, it is.
6      Q.  So this reflects information that
7  AstraZeneca had prior to Apotex's launch?
8      A.  It represents a subset of the information
9  they had prior to launch.  It's not comprehensive
10 with regard to all information they had.
11     Q.  If you'll turn to page 6 of the document,
12 which is marked 185343, do you see a chart labeled
13 "omeprazole Situational Analysis"?
14     A.  I do.
15     Q.  And do you see it's for KUDCo, Mylan, Lek
16 and Prilosec?
17     A.  Yes.
18     Q.  And is it your understanding that this is
19 a comparison of the three generic manufacturers that
20 were on the omeprazole market at the time and
21 Prilosec?
22     A.  The omeprazole product rather than market.
23     Q.  But KUDCo, Mylan and Lek were actually
24 selling generic omeprazole at the time, by
25 October 3rd, 2003?

Page 60

1      A.  Yes.
2      Q.  And if you look down to the third row,
3  where it says "Gross/Net Price Per Pill
4  (20 milligram 30 count)," do you see that row?
5      A.  Yes, I do.
6      Q.  And do you see where all the way on the
7  right, for Prilosec you have a gross of 3.69, a
8  lowest retail of 2.76 and a mail of 1.66?
9      A.  Yes.
10     Q.  And do you understand that as the WAC
11 cost, the cost less rebate, and then the cost to
12 mail order or the price to mail order?
13     A.  I don't understand your question.
14     Q.  Do you see the --
15     A.  Do I understand what?
16     Q.  The three numbers.  You see the gross, the
17 lowest retail and the mail.
18     A.  Mail order.  I presume that "Mail" is mail
19 order.
20     Q.  Okay.
21     A.  Okay?
22     Q.  And the gross, what would that mean?
23     A.  That would be the gross price before any
24 deductions, whether they be chargebacks, rebates,
25 discounts, other discounts.

Page 61

1      Q.  And then the lowest retail is 2.76.  So
2  that would be minus any of those factors that you've
3  just listed?
4      A.  No.  I don't see anyplace on this document
5  where they show how they've computed the lowest
6  retail.  So no, I don't know that it's netted out
7  all those factors.
8      Q.  Do you have a reason to suspect that
9  they're not?  That there's something else --
10     A.  No.
11     Q.  -- that they would be --
12     A.  But I'm not --
13     Q.  -- getting for lowest retail?
14     A.  Do I have any reason to believe they're
15 not?  No.  Do I have any reason to believe they are?
16 No.  "No" on both counts.
17     Q.  So when you look at the KUDCo and Mylan,
18 which also have different numbers in them, on that
19 same row --
20     A.  Yes.
21     Q.  -- do you see where their mail order price
22 appears to be broken out?
23     A.  Yes.
24     Q.  All right.  So that's:
25     "Mail order believed approximately 46

Page 62

1    cents."
2      Is that correct?
3      A.   That's based, I presume, on their market
4    intelligence, which may or may not be correct.  But
5    that's presumably what they've recorded here.
6      Q.   And it's the market intelligence that
7    AstraZeneca had at the time?
8      A.   Yes.
9      Q.   And then this row indicates that both for
10   KUDCo and Mylan, there's a 2.70 gross price and then
11   a net price per pill of $1.89 to $2.30.  Is that
12   correct?
13     A.   That's what's recorded here, yes.
14     Q.   And does that appear to record some form
15   of discount from the gross price per pill?
16     A.   If there's a distinction -- and I presume
17   all the other documents make a distinction between
18   gross and net -- the answer would be yes.
19     Q.   What would your understanding be of what
20   that distinction would rely on between gross and
21   net?
22     A.   Well, first of all, they're looking across
23   all the channels; and the channels for the
24   distribution of volume, the pricing of those
25   channels is dramatically different.

Page 63

1      So if I'm looking at mail order, mail
2    order particularly, as I point out in my
3    declaration, are often prescriptions written for
4    90 days, and mail order is usually among the low
5    price points within the channels that exist.  The
6    retail channel is, generally speaking, the higher
7    price point.
8      And here, the actual recording of this
9    particular data for mail order, it's no surprise
10   that mail order is much lower and that market
11   intelligence would be correct, given all the data
12   that I've seen with regard to mail order.
13     It turns out that the amount of volume
14   moving through mail order is dramatically less than
15   what moves through the retail channel.  So the
16   weighting of that particular price in terms of the
17   overall market price is very low; and as a result,
18   one can't rely on what's going on in mail order with
19   regard to determining what is the effective price
20   that third-party payers, that patients, that retail
21   pharmacy, any participants in the institutional
22   determination of value actually see.
23     Q.   Okay.  And before I go back to that
24   answer, you said "dramatically lower."  Do you have
25   an understanding of the percentage of, say, Nexium

Page 64

1    sales that go through mail order?
2      A.   Yes, I've computed that.  The -- I'd have
3    to go back and look at the data.  I don't have that
4    memorized, but it's certainly well below 20 percent.
5      Q.   So the answer that you just gave, you've
6    certainly broken out the mail order as generally
7    being a much lower price, both for generics and for
8    brandeds.
9      But what I'm asking about this gross/net
10   price per pill row is, there's a separation between
11   the gross price, the net price and then the mail
12   order price.  Do you see that?
13     A.   In the first two columns?  Because it's
14   not with regard to Lek.
15     Q.   Not -- exactly.  But for KUDCo, for Mylan
16   and for Prilosec, all three of those break out a
17   gross price, a net price and a mail order price.  Do
18   you see that?
19     A.   Yes, I see that.  This is their market
20   intelligence.  This is not the actual data.
21     Q.   This is -- fine.  The question I was
22   asking is:  Because they've broken out the mail
23   order price, it appears that the gross and net
24   prices for KUDCo and Mylan, they have a gross price
25   of 2.70 and then a net price of $1.89 to $2.30.

Page 65

1      Does this indicate that they are offering
2    some sort of either rebate or discount off of their
3    gross price?
4      A.   They -- no, it doesn't suggest they're
5    offering rebates off their gross price.  It could be
6    they're offering chargebacks to wholesalers that
7    are -- these are wholesaler products.  They may be
8    offering chargebacks to wholesalers.  You don't know
9    that those are rebates.
10     Q.   Okay.  And can you explain the difference
11   between chargebacks and rebates as to -- actually,
12   just can you explain the difference there?
13     A.   Rebates are a category that's used to
14   explain, as I think I've already testified here
15   today, the incentives that manufacturers offer to
16   managed care; and generally, those contracts specify
17   a base rebate along with additional incentives for
18   more rebates if larger volume is moved.
19     Chargeback, in contrast, are offered to
20   wholesalers to assure that they've got incentives to
21   move the product when there are discounts offered
22   downstream at the retail pharmacies.
23     So fundamentally, a wholesaler comes back
24   and says:  You -- the manufacturer -- You've entered
25   into a contract with these retail pharmacies.  The

Page 66

1  price that I've paid is, say, the wholesale
2  acquisition cost. And you've offered a discount
3  downstream, and I want to be made whole.
4      And as a result, the manufacturer gives
5  those wholesalers a chargeback.
6      Q. So with a chargeback . . .
7      I'm sorry. So in a situation with a
8  chargeback, are you saying that the generic
9  manufacturer has deals with pharmacies, retail
10  pharmacies themselves --
11      A. May or may --
12      Q. -- getting discounts?
13      A. I'm just giving you -- you asked what the
14  difference was.
15      Q. Yes.
16      A. I gave you a description of the
17  difference. I haven't seen any contracts produced
18  through discovery the generics have with retail
19  pharmacy. I'm giving you how the industry defines
20  "chargebacks" and how they arise and under what
21  conditions.
22      That would hold as well with regard to
23  Nexium and Prilosec. There are chargebacks. Look
24  at the P&Ls that are produced by AstraZeneca with
25  regard to Nexium and/or Prilosec, and you'll find

Page 67

1  that they have actual recording of rebates versus
2  chargebacks versus other sorts of deductions against
3  the gross price.
4      Q. And did you review all of those various
5  deductions against the gross price in your analysis
6  of Nexium's price or just rebates?
7      A. Can you be more specific with regard to
8  which data? With regard to the IMS data? With
9  regard to the pharmacy logs? With regard to
10  AstraZeneca's P&Ls? Which data are we talking
11  about?
12      Q. When you ran your analysis comparing the
13  net cost of Nexium to the net cost of generic
14  omeprazole, did you look at all discounts or just
15  rebates?
16      A. I looked specifically at the position of
17  third-party payers. Third-party payers don't get
18  chargebacks. Hence, you wouldn't look at
19  chargebacks.
20      But implicitly, implicitly, if there are
21  chargebacks, then that would be reflected in the
22  reimbursement rate for the retail pharmacy with
23  regard to the dispensing. If there is a chargeback,
24  it would be built into the pricing.
25      Q. So whether this --

Page 68

1      A. But the rebate would not be built into the
2  pricing that you see in terms of the pharmacy logs.
3      Q. Let's make this precise by looking at your
4  report.
5      A. I thought I was being precise.
6      Q. No, no. My next question.
7      A. Oh.
8      Q. So on page 14 of your report, at the
9  beginning -- in paragraph 26, under the heading C,
10  "Factors that Determine Effective Price of a Drug to
11  a Third Party Payer" --
12      A. Yes.
13      Q. -- you set out the five factors as:
14      "(1) the pharmacy reimbursement, (2) the
15      consumer co-pay, (3) manufacturer rebates,
16      (4) the aggregate daily average
17      consumption rate for the drug, and (5)
18      free samples."
19      Did I read that correctly?
20      A. You did.
21      Q. Great. So I see No. 3, you break out
22  manufacturer rebates.
23      A. Yes.
24      Q. My understanding of what you've just said
25  about chargebacks is that that would affect the

Page 69

1  pharmacy reimbursement.
2      A. Yes, that's correct.
3      Q. So whether these -- going back to -- I'm
4  sorry.
5      Going back to Exhibit 7, page 6, that row
6  that we've just been talking about, whether that
7  $1.89 to 2.30 price is the result of a rebate or a
8  chargeback, either way that should affect the way
9  that you determine the net cost for the drug?
10      A. Yes.
11      Q. Did you consider chargebacks for generic
12  omeprazole in determining your net cost?
13      A. That's built in to the pharmacy
14  reimbursement rate.
15      Q. So that's already in the pharmacy log
16  data? That's what you're saying?
17      A. That's exactly what I'm saying.
18      Q. Okay. Going back to Exhibit 7 but this
19  time turning to page 7, this is 185344. Do you see
20  this chart?
21      A. I do.
22      Q. Okay. So this is the "WAC & Deepest
23  Rebate in HMO/PBMs." This is a chart that we've
24  just seen in another exhibit but for a different
25  time period; is that correct?

ASTRAZENECA AB vs. APOTEX
Gordon Rausser Confidential

Job 15216
Pages 70..73

1   A.  Yes.
2   Q.  So this is a chart that AstraZeneca has
3   put together October 3rd, 2003?
4   A.  Well, I presume they put it together
5   sometime before that, but --
6   Q.  So this is --
7   A.  -- they reported it --
8   Q.  -- information --
9       Thank you.
10  A.  They reported it on October 3.
11  Q.  This is information that they had prior to
12  Apotex's launch?
13  A.  Yes.
14  Q.  And do they indicate that they know of
15  rebates that are being paid for generic omeprazole?
16  A.  My response for this particular graph is
17  exactly the same as it was for the graph that you
18  asked me about in Rausser Exhibit 6.
19  Q.  And your response is that it's unreliable?
20  A.  It's unreli-- yes, indeed.  It's
21  unreliable, first of all.
22      Secondly, any rebates, as I indicated, for
23  omeprazole, the only evidence is if there are any
24  rebates, it's only with regard to the mail order
25  channel, which is a very small channel in terms of

1   the total volume of product moving through the
2   market, number one.
3       And number two, the "deepest rebate"
4   doesn't mean anything.  You can have extreme values.
5   You can have instances where there is a one-off deal
6   that is not systematic within the marketplace.  So
7   it's meaningless.  This is unreliable.
8   Q.  Did you, in coming to the conclusion that
9   there were no rebates for generic omeprazole, review
10  the documents produced by Apotex in this case?
11  A.  Review the documents produced by Apotex.
12  Yes, I certainly look at -- looked at them, yes.
13  Q.  But that's not reflected in your Exhibit C
14  to your declaration?
15  A.  No, because even though I reviewed it, I
16  didn't rely on it with regard to my analysis that's
17  reported in that declaration.
18  Q.  Do you understand that you're supposed to
19  report everything you considered, not just what you
20  relied upon?
21      MR. ANDERSON:  Objection; calls for a
22  legal conclusion.
23      THE WITNESS:  My understanding is that in
24  my report it's self-contained with regard to the
25  information that I relied upon and I cited in my

1   report.
2       With regard to the Apotex that you just
3   asked me about, I don't believe I reviewed that
4   before my declaration.  That was something that I've
5   looked at subsequently.
6   BY MS. KINBURN:
7   Q.  Oh, thank you for the clarification.
8       So you did not, prior to submitting at
9   least your initial declaration, view any Apotex data
10  to determine whether Apotex was, in fact, offering
11  rebates?
12  A.  No.  I did, however, in my prior Nexium
13  work, I did interview AstraZeneca officials about
14  whether, in fact, there were any rebates offered by
15  generics, including Apotex or Mylan or any other
16  generics that were out there; and they made it
17  crystal-clear that the only rebates they were
18  offering was with respect to the mail order channel.
19  Q.  And I believe that you've mentioned that
20  you did not take into consideration mail order when
21  running your analysis.  Is that correct?
22  A.  When running -- I did not take into
23  account mail order, no.  I'm looking at retail
24  pharmacies.  You've seen the sample, and I've
25  specified where the sample was concentrated, what

1   data was collected, and it did not include mail
2   order.
3   Q.  And is there a point at which you would
4   think that not including mail order would -- when I
5   say "a point," a volume of Nexium going through mail
6   order that would necessitate including mail order in
7   your analysis?
8   A.  No.  No, not at all.
9   Q.  So if 75 --
10  A.  The best --
11  Q.  -- percent went through it, that would not
12  be necessary to review mail order?
13  A.  Certainly, if 75 percent went through it,
14  but 75 percent did not go through it.  Not even
15  close.  In fact, a very small percentage, as I
16  specified earlier, went through mail order.
17  Q.  If you could take a look at Exhibit 6,
18  this is the Nexium SCO brainstorm meeting.
19  A.  Are we through with 7, or should I hold it
20  here?
21  Q.  Hold on to it.  You never know when you're
22  going to come back.
23      I'm looking at page 13.
24  A.  13?
25  Q.  And this is as of August 3rd, 2004.

Page 74

1   A.  I'm looking at it.  Is there a question?
2   Q.  Yeah.  Do you see there's the PPI market
3   in general, Nexium, Prevacid and Protonix?  And
4   those are in a chart form?  And Nexium is the second
5   column?
6   A.  Yes, I do see that.
7   Q.  Okay.  Do you see how mail order is the
8   second from the bottom?  And this is a percentage of
9   volume of these various PPIs that run through these
10  channels.
11  A.  Yes.
12  Q.  Do you see where it shows 24 percent of
13  Nexium's volume going through mail order?
14  A.  I do.
15  Q.  And do you still consider that too small a
16  percentage to necessitate including in your
17  analysis?
18  A.  Yes, for the following reason:  This is in
19  '04, and if you're coming up to the hypothetical
20  negotiation, the IMS data reports this share for
21  Nexium being much lower than what's recorded here.
22  Q.  And do you know what that was?
23  A.  You've already asked me that question, and
24  I've told you what I recall.
25  Q.  Okay.  So you recall it being a little

Page 75

1   less than 20 percent?
2   A.  Yes.
3   MS. KINBURN:  Do we need to take a break
4   to change out the video?
5   THE VIDEOGRAPHER:  Sure, anytime.
6   MS. KINBURN:  Might as well.
7   THE VIDEOGRAPHER:  This now ends Tape
8   No. 1 in the video deposition of Gordon Rausser.  We
9   are going off the record at 11:14.
10  (Recess taken.)
11  THE VIDEOGRAPHER:  This marks the
12  beginning of Tape No. 2 in the video deposition of
13  Gordon Rausser.  We are now back on the record at
14  11:31.
15  BY MS. KINBURN:
16  Q.  Dr. Rausser, I believe that we have spoken
17  before about the fact that there were a number of
18  PPIs in the market at the time in 2002-2003 and
19  that, as I believe you said, third-party payers
20  would have taken into consideration the cost and
21  efficacy of these various PPIs in determining where
22  to place them on their formulary.  Is that accurate?
23  A.  You said cost as well?
24  Q.  Cost --
25  A.  Yes.

Page 76

1   Q.  -- and efficacy?
2   A.  Yes.  Their net cost.
3   Q.  You've already stated that Nexium really
4   sold itself on its efficacy, on the fact that it was
5   the gold standard.
6   A.  Relative to Prilosec.
7   Q.  Relative to Prilosec.
8   How did that -- how would that have
9   factored into the third-party payers' decisions for
10  what formulary status to give it?
11  A.  Everything else constant, the greater
12  efficacy would place it on a more favorable tier,
13  everything else constant.
14  Q.  And do you know or have you investigated
15  how the net cost of Nexium compares to the other
16  PPIs, the other branded PPIs?
17  A.  First of all, that's not possible -- I've
18  already told you that earlier today -- because you
19  don't have the net prices for the other PPIs.  To
20  get those net prices, you need rebates and
21  chargebacks.  That's proprietary information that is
22  not reported by IMS.  You would have to have access
23  to their product-specific P&Ls.
24  And that information or that data was not
25  available to me at the time of my reports in this

Page 77

1   matter, or was it available to me in the two earlier
2   reports that I filed on Nexium.
3   Q.  Is that information, the net cost of these
4   various PPIs, information that would have been
5   available to the third-party payers when they were
6   making their decisions?
7   A.  Certainly.  They would have known what the
8   rebates were that were being offered by those
9   specific PPIs.
10  I have -- in the pharmacy log data, I have
11  other transactions in which there was transactions
12  for those PPIs, other PPIs aside from Nexium and
13  omeprazole, but that wasn't the purpose for my
14  analysis.  So I did not look and/or summarize that
15  from the pharmacy log data.
16  However, the pharmacy log data has been
17  produced.  One can certainly look at what is the net
18  price reported for those transactions related to
19  other PPIs.
20  Q.  Your opinion with regard to the net cost
21  of Nexium is that a third-party payer would be more
22  likely to place Nexium on a favorable formulary
23  status if its cost, its net cost was less than
24  omeprazole, generic omeprazole; is that correct?
25  A.  Yes, certainly, that is correct.  But in

Page 82

1  the net cost, no.  I was asked only to evaluate
2  those two products with regard to third-party
3  payers.
4        In my earlier analysis, as I've already
5  testified, I looked at all the PPIs with respect to
6  the market dynamics, the substitutability, the
7  switching from one drug to another.  I looked at
8  switching data.
9        That's not relevant here.  We come into
10  the hypothetical negotiation, that's all given.
11  There is a perspective, a lens on that market
12  dynamics that AstraZeneca has.  And I'm looking at a
13  fundamental question:  Would they be worse off after
14  the entry of Apotex vis-a-vis where they stood
15  before?
16        And one distinct advantage they had before
17  is they could offer more incentives to third-party
18  payers to capture more volume for Nexium, which is
19  their fundamental value proposition at that point in
20  time in the marketplace, not Prilosec or not
21  Prilosec OTC, either.
22      Q.  From a purely net cost perspective, would
23  the other PPIs, particularly Protonix and Prevacid,
24  having a lower net cost than Nexium affect the
25  advantage that you see Nexium having by being net

Page 83

1  cost cheaper than generic omeprazole?
2      A.  I can't answer the question without
3  knowing the third-party payer, what is the
4  foundation that they have with regard to the science
5  and whether Nexium has superior efficacy versus the
6  other PPIs.  And that's not something that you've
7  specified in your question, so I can't answer the
8  question.
9      Q.  I think I said on a purely net cost basis.
10      A.  Well, there is no purely net cost basis.
11  You don't make choices on a purely net cost basis.
12      Q.  But the advantage that you've put in your
13  analysis is based purely on the relative costs of
14  generic omeprazole and Nexium; is that correct?
15      A.  That is correct.  And I've represented to
16  you that AstraZeneca makes representations about the
17  superior efficacy of Nexium.  There are other
18  elements of the market that argue that there is no
19  incremental efficacy of Nexium.  These are
20  assertions that are out in the marketplace.
21        In fact, the prior case and all the work I
22  did with respect to Nexium was based on the
23  plaintiffs' assertion that there is no difference
24  from Nexium and Prilosec.  So in their perspec- --
25  from their perspective, the efficacy differential is

Page 84

1  zero.
2      Q.  What I'm asking is, given the fact that
3  you do not factor in efficacy into your comparison
4  of generic omeprazole and Nexium, why you believe
5  that would be necessary in order to compare net
6  costs on a hypothetical basis.
7      A.  I'm sorry.  I don't understand your
8  question.
9        You're not going to get me to answer a
10  question that cherry-picks part of the
11  decision-making process with regard to trade-offs.
12  I'm not going to do it.
13        If you want to specify a complete
14  hypothetical, taking into account what the PT
15  committees or the third-party payers have evaluated
16  with regard to efficacy and the trade-offs on that
17  efficacy and then I can measure the incremental cost
18  against it, I could give you an answer to your
19  question.  But aside from that, you're not going to
20  get an answer from me.  I'm sorry.
21      Q.  Did you take all of that into
22  consideration in comparing the cost of generic
23  omeprazole and Nexium?
24      A.  My report stands within the four corners
25  of each page of the report.  It looks specifically

Page 85

1  at what is the advantage to third-party payers of
2  having to reimburse for Nexium versus omeprazole
3  from a cost perspective.  That's it.
4      Q.  Now, we've discussed paragraph 26 of your
5  report, which lays out the five different factors
6  that you take into consideration in creating your
7  net cost number.  Is that correct?
8      A.  That is correct.
9      Q.  And one of those is free samples; is that
10  right?
11      A.  Yes, that is correct.
12      Q.  And in your calculation, you take a
13  hundred percent of the free samples that you have
14  data for and you subtract that or you net that out
15  of the cost of Nexium; is that correct?
16      A.  Yes.
17      Q.  Do you have an understanding as to how
18  many of those free samples actually go to lives
19  covered by third-party payers?
20      A.  How much of the free samples -- no.  IMS
21  simply reports in their promotion, marketing
22  documents that they publish with regard to free
23  samples, and that looks at the total free samples,
24  whether those free samples go to uninsured or
25  insureds.  So the answer to your question, no, you

Page 90

1    MS. KINBURN:  Can we just go off the
2  record for two seconds?
3    THE VIDEOGRAPHER:  We're now going off the
4  record.  The time is 12:04.
5    (Discussion off the record.)
6    THE VIDEOGRAPHER:  We're now back on the
7  record.  The time is 12:05.
8    THE WITNESS:  These two studies you've
9  given me, more importantly, do not pertain to PPI
10  drugs.  And I don't see, in either one of the two
11  studies, any differentiation with regard to the type
12  of therapies.  They obviously are legitimately
13  concerned with those drugs that have serious side
14  effects, those that have potential for abuse or
15  dependence.
16    So I don't know of any studies for these
17  kinds of surveys that are attempting to determine
18  the ethical behavior of physicians with regard to
19  the PPI drugs.  It's my understanding that they are
20  not subject to abuse and have any serious
21  dependence -- dependence issues.
22    Secondly, the real purpose of the free
23  samples is to expand the commercial base for a
24  particular therapy.  And even if a physician
25  utilizes those free samples themselves or other

Page 91

1  members of the staff use them, if they turn out to
2  be effective, it may lead to more prescriptions,
3  which is, in fact, the reason for the free samples
4  to begin with.
5    Coming back to your question that pertains
6  to my analysis, the free samples doesn't make any
7  difference anyway.
8  BY MS. KINBURN:
9    Q.  Okay.  If you could turn to page 6 of your
10  report -- actually, it's page 5 to 6.  It's the
11  paragraph 11 of your summary conclusions.
12    A.  Paragraph 11.  I'm there.
13    Q.  Okay.  And in this paragraph, you talk
14  about the relative costs of Nexium and omeprazole
15  and formulary status where -- and this is at the
16  bottom of page 5:
17    "More costly drugs are likely to
18    receive less favorable formulary status,
19    which is associated with higher co-pays
20    and lower sales."
21    And so the last sentence of your paragraph
22  is:
23    "Loss of this advantage could have
24    threatened Nexium's favorable formulary
25    status and its market share."

Page 92

1    That is your opinion; is that correct?
2    A.  That's certainly my opinion.
3    Q.  And you rely on Dr. Navarro and his
4  declaration in discussing formulary status, is that
5  correct, or is this from your own understanding and
6  knowledge?
7    A.  It's certainly from his report or
8  declaration, but it's from my own understanding and
9  all the work that I've done over the last 20-plus
10  years in this industry, and the work specifically
11  with regard to all of the analysis that I've
12  conducted; as I indicated, more than 40, as many as
13  60 cases in which the question of formulary status
14  and net cost to third-party payers is crucial.
15    Q.  And can you define "favorable formulary
16  status"?
17    A.  Certainly.  There's huge variability in
18  terms of managed care and/or third-party payers with
19  regard to formulary; but a simple lens along the
20  determination of formularies is that most managed
21  care operate with three basic tiers.  Now, there's
22  some -- there's a lot of variation.  Some have four,
23  five tiers, but most operate with three tiers.
24    The distinguishing characteristics of the
25  tiers with regard to the ultimate patient population

Page 93

1  or the covered lives is:  What is the co-pay?
2    And the co-pay is generally the lowest for
3  Tier 1.  All the generics sit at that tier.  Tier 2
4  has a higher co-pay.  There are branded drugs there
5  and many of which offer some incentives for being in
6  that particular tier.  There's Tier 3.
7    And then there's variations in terms of
8  the formulary.  There can be pre-authorization.
9  There can be specific qualifications that have to be
10  satisfied.
11    Prevacid, for example, in some data that I
12  saw in the Nexium matter, there were instances where
13  some of the formularies actually had to -- for each
14  of their covered lives, had to try some other PPI
15  before they could turn to Prevacid.  That was also
16  true on some formularies with regard to Aciphex as
17  well.
18    So there are other sorts of control levers
19  that managed care has with regard to authorizing
20  some portion of the reimbursement for a dispensed
21  therapy by a retail pharmacy.
22    Q.  Okay.  And as I believe you've said,
23  co-pays are determined by the formulary tier that a
24  drug is on?
25    A.  Generally speaking, yes.  There is a lot

ASTRAZENECA AB vs. APOTEX
Gordon Rausser Confidential

Job 15216
Pages 134..137

Page 134

1  status, you can certainly do so.  You'd have to go
2  and look at the actual underlying contracts that
3  AstraZeneca has with these third-party payers that
4  are revealed in the pharmacy logs.
5       Those contracts exist.  In the prior
6  cases, I've reviewed those contracts.  And those
7  contracts will tell you what is the formulary status
8  after the rebates.  I think some of them will also
9  tell you what they were before.
10      So you can look at:  Gee whiz, what was
11  the benefit of the bargain?  They offered this in
12  the way of rebates and now they're on Tier 2.
13      I don't recall any contracts where they
14  moved to Tier 1.  There may be some, but I don't
15  recall seeing any of those contracts.
16      But when they offered the rebate, what
17  happens then is that they're on this -- at least
18  with regard to the cost dimension, for some of the
19  managed care third-party payers, they're on the same
20  playing field as omeprazole.
21      Q.  When you say "they're on the same playing
22  field as omeprazole," do you mean the same tier?
23      A.  No.  I mean the same effective cost.
24      Q.  Same effective cost?
25      A.  Yeah.

Page 135

1       Q.  All right.  Going back to your report,
2  page 3, paragraph 6.
3       A.  Yes.
4       Q.  You note that a previous version of your
5  analysis was included in declarations from 2008
6  submitted in James Weiss, et al. versus AstraZeneca
7  in California, and Commonwealth Care Alliance versus
8  AstraZeneca in Massachusetts.  Is that correct?
9       A.  Yes, it is.
10      Q.  In the James Weiss case, your conclusions
11  were just with regard to the price of Nexium and
12  generic omeprazole in California; is that correct?
13      A.  The sample of pharmacies in the state of
14  California, yes.
15      Q.  And in the Commonwealth case, your samples
16  were, likewise, drawn from Massachusetts; is that
17  correct?
18      A.  That is correct.
19      Q.  Do you believe that the analysis you did
20  for these two and the data that you pulled for these
21  two cases is generalizable or applicable to the
22  entire United States market?
23      A.  I've seen no evidence that it isn't.  In
24  particular, many of those third-party payers operate
25  throughout the country; and they -- with regard to

Page 136

1  the AstraZeneca offer of rebates for creating
2  incentives for moving more volume by managed care,
3  they generally offered that to the entire
4  marketplace.  Some of the managed care third-party
5  payers accepted the offer and/or renegotiated and
6  some didn't.
7       But yes, I would expect the implications
8  of this to exist throughout the country, and I have
9  seen no evidence to suggest otherwise.
10      Q.  Just to confirm, it's your understanding
11  that AstraZeneca offered the same rebates to all of
12  the third-party payers throughout the United States?
13      A.  Let's be careful about "offer."  There's
14  an offer; there's an ask; there's a negotiation
15  process that goes on.
16      It's my understanding that they offered a
17  generic version to all managed care, but then there
18  was negotiation that went on that resulted in a
19  contractual relationship.  It wasn't the same
20  contractual relationship with respect to each and
21  every third-party payer.
22      But if, for example, Blue Cross/BlueShield
23  got this specific relationship with AstraZeneca with
24  regard to rebates, Blue Cross/BlueShield in Alabama
25  would also get the same kind of contractual

Page 137

1  relationship, if desired by them.
2       And that can be confirmed by simply
3  looking at the underlying contracts that are
4  revealed in a summary fashion by AstraZeneca's P&L
5  for Nexium, because they include an aggregate rebate
6  number, but lying behind that is all the contractual
7  relationships that they have throughout the country.
8       MS. KINBURN:  I'd like to mark this next
9  exhibit as Exhibit 14.
10      (Whereupon, Deposition Exhibit 14 was
11  marked for identification.)
12      MS. KINBURN:  And for the record, this is
13  an SK&A consumer access to pharmacies in the United
14  States from the year 2007.
15  BY MS. KINBURN:
16      Q.  You can look at whatever you like.  I'm
17  looking at page 3.
18      A.  All right.
19      Q.  Okay.  And so on page 3 of that document,
20  the words at the very top show Figure 1 as:
21          "Nearly 59,000 Retail Pharmacies
22          Operate in the United States."
23      Is that correct?
24      A.  That's what it says.
25      Q.  All right.  And do you have reason to

ASTRAZENECA AB vs. APOTEX
Gordon Rausser Confidential

Job 15216
Pages 138..141

Page 138

1  believe that that would be significantly different
2  from 2003, when you ran your -- when you pulled your
3  data for the report?
4      A.  Significantly different in terms of
5  numbers?
6      Q.  Yes.
7      A.  I have no knowledge to suggest it would be
8  significantly different.
9      Q.  Okay.  And this figure shows that
10 Massachusetts had approximately 1,077 pharmacies.
11 It's in the --
12     A.  I see.  Yes.
13     Q.  And then California had 5,350; is that
14 correct?
15     A.  That's what it says, yes.
16     Q.  Okay.  How many pharmacies did you pull
17 data from for your analysis?
18     A.  The sample size was 30.
19         MS. KINBURN:  I believe we need to break
20 in a minute, so I think this would be a good point.
21         THE WITNESS:  Okay.
22         THE VIDEOGRAPHER:  This now ends Tape
23 No. 2 in the video deposition of Gordon Rausser.
24 We're now off the record at 2:21.
25         (Recess taken.)

Page 139

1          THE VIDEOGRAPHER:  This marks the
2  beginning of Tape No. 3 in the video deposition of
3  Gordon Rausser.  We are now back on the record at
4  2:40 -- excuse me -- :33.
5  BY MS. KINBURN:
6      Q.  All right.  Dr. Rausser, in conducting
7  your analysis for this case, did you include any
8  additional data that you did not use in your James
9  and Commonwealth cases?
10     A.  Additional data?
11     Q.  I'm sorry.  Additional pharmacy log data.
12     A.  No.  It's the same data.  The pharmacy log
13 data was the same data.
14     Q.  Did you -- how did you decide to rely just
15 on the data that you had collected in those previous
16 two cases?
17     A.  How did I decide to rely?
18     Q.  Did you put any thought to whether that
19 data would be sufficient to speak for the entire
20 United States?
21     A.  Did I give any thought?  I certainly did.
22 In my -- I actually referred to the sample and the
23 limited nature of the sample; however, that it was
24 the best available information to analyze the
25 question that I was asked to evaluate.

Page 140

1          And we all know that there are lots of
2  prices out there in the pharmaceutical industry,
3  many of which do not relate to actual transactions.
4  This is the best available data on the question that
5  I've been assigned that goes to actual transactions.
6      Q.  What would be the best unavailable data on
7  that question, if in the best of all possible worlds
8  you had access to whatever data you wanted?
9      A.  Well, now you're -- you have to take into
10 account the cost.  I'm assuming there's no budget
11 constraints.
12     Q.  Yes.  No confidentiality constraints.  You
13 can just get whatever you need.
14     A.  Well, the best -- under those
15 circumstances, if -- unrealistically, if you presume
16 that you could get whatever data you want, you'd
17 want all of the pharmacy logs because that's where
18 the actual transactions take place.
19         And that would be prohibitively expensive.
20 I don't know that anybody ever -- has ever gone out
21 and collected all of the primary transactions with
22 regard to each and every pharmacy in the country.
23 But a complete population, under your structure in
24 which cost doesn't matter, you'd collect all the
25 primary transactions.

Page 141

1      Q.  And if you hadn't been relying on the two
2  previous data collections, would you have chosen
3  other pharmacies to collect your data from?
4      A.  That's not a question I've given any
5  thought to.  There is significant cost of collecting
6  just this data.  And I know of no other instance
7  where, within the pharmaceutical industry, someone
8  has gone out and collected -- designed a sample,
9  gone out, done a random selection of the pharmacies,
10 collected and summarized the data in a litigation
11 dispute of this type.  So that was certainly an
12 important issue in the Nexium matter.
13         In this particular matter, looking at the
14 benefits versus cost and whether this information
15 was sufficient for the question that I was asked to
16 analyze, it's sufficient for the purposes of the
17 question that was put to me.
18     Q.  Okay.  And just for clarity of the record,
19 what exactly was that question again?
20     A.  I specify right up-front.
21         "I was engaged by counsel for the
22         plaintiffs . . . to compute third
23         party . . . cost per day of therapy for
24         two drugs, Nexium and generic
25         omeprazole . . . ."

Page 142

1      That's the question.
2      But then with regard to my expertise in
3  economics, my understanding of the industry, the
4  strategies that are used by generics versus branded
5  pharmaceutical companies, the structure of the
6  institutions, what managed care does with regard to
7  entering into contractual relationships on rebates
8  and offering volume increases, that all too is
9  related to taking that analysis into an opinion that
10  I've expressed in my report.
11      Q.  You mentioned designing a sample.  Not in
12  this last answer, but the one before.
13      If you had not been working off of the
14  James Weiss and Massachusetts Commonwealth data
15  sets, how would you have designed a sample to sample
16  these pharmacy logs?
17      A.  If what?  What was the first part?
18      Q.  If you hadn't been relying on the
19  California and Massachusetts cases.
20      A.  By the way, I can't answer that question.
21  It depends on what the purpose is for your analysis.
22  You can't ask a generic question about if you could
23  satisfy any wish that you want to specify.  I have
24  to know what the purpose is.
25      You don't go out and collect a sample.

Page 143

1  You don't do an analysis of a sample and draw
2  inferences for the complete population unless you
3  have a purpose.  What's the purpose for the
4  analysis?
5      I told you what my purpose was.  My
6  purpose is to compare the third-party cost of
7  therapy for two different drugs.  Given that that's
8  my purpose, is the data here sufficient for that
9  purpose?  Yes, it is.
10      Q.  The question I'm asking --
11      A.  If you want to -- I'm sorry.  If you want
12  to change the purpose and give me another purpose
13  and ask me the question what data would I want to
14  collect, whether I could use secondary data or
15  whether I could use IMS data or whether I could use
16  AstraZeneca's own internal documents, then certainly
17  the data that I'd want to analyze is different if
18  the question's different.
19      Q.  Given the same question you were asked in
20  this case, in a hypothetical world where you had not
21  previously run an analysis or gathered data, the
22  pharmacy log data for the previous California and
23  Massachusetts cases, would you have pulled from the
24  same pharmacies to collect your pharmacy log data?
25      A.  No, because I would have -- no, because it

Page 144

1  turns out that when I do a random selection of which
2  pharmacies to subpoena, it would have been a
3  different selection.
4      That's how you do random sample surveys.
5  You actually end up doing a new random selection.
6      No, they wouldn't be the same.
7      Q.  I recognize that a random selection of
8  different -- I'm sorry -- of the same population is
9  going to get you --
10      A.  Right.
11      Q.  -- different results.
12      Right?
13      A.  Right.
14      Q.  So if we're just looking in California and
15  you were doing a random selection of California
16  pharmacies, each time you pulled it, it would be
17  different.  That's what randomness --
18      A.  Yes.
19      Q.  -- creates.
20      A.  Yes.
21      Q.  There's a difference between the
22  randomness you get within a set and randomness you
23  get between sets that are different.  Is that
24  correct?
25      So you'd get different random selections

Page 145

1  from only California than you would from the United
2  States as a whole?
3      A.  In other words -- let me see if we can
4  change this.  If in terms of the universe from which
5  I'm selecting the random selection, if it's beyond
6  just California and Massachusetts, certainly I would
7  get a different random selection than I would if I
8  just restricted it to Massachusetts and California.
9  Certainly.
10      Q.  And the selection -- let's restrain this
11  part of the discussion just to California pharmacy
12  logs.  Not all of those pharmacies were picked as a
13  result of random draw; is that correct?
14      A.  No, I don't believe that is correct.  We
15  did certainly stratify it.  So when you say it
16  wasn't purely random, we did end up wanting
17  representation that was stratified.
18      We wanted chain pharmacies.  We wanted at
19  least some local pharmacies to be included.  We
20  wanted certainly a mass retail store that has
21  pharmacies.  So it was stratified to that degree.
22      Q.  Do you have a recollection that at least
23  one of the pharmacy chains that you -- I'm sorry --
24  pharmacy locations that you picked was picked
25  because one of the representative plaintiffs had

Page 146

1  made a purchase there?
2      A.  Yes.  Certain- -- certainly that was one
3  of the issues with regard to the plaintiffs, named
4  plaintiffs, yes.
5      Q.  So that -- so that would not have been a
6  random selection?
7      A.  There was a constraint with regard to the
8  sample selection to at least encompass, to the
9  degree we could, who were the named plaintiffs.
10       But there's not a shred of evidence to
11 suggest that the results for those pharmacies that
12 were located or frequented by those named plaintiffs
13 are non- -- non-representative.  I don't know of any
14 evidence along those lines.
15     Q.  Did you run any statistical analysis or
16 any other analysis to determine the
17 representativeness of the 30 pharmacies that you
18 looked at?
19     A.  No.  It's common sense.  I mean, we looked
20 at -- both in California and Massachusetts, we
21 looked at stratification with regard to who are the
22 dispensing pharmacies that are out there.
23       To be able to analyze the inferences that
24 are drawn from those, you would have to do repeated
25 samples.  And that's something that's very costly.

Page 147

1  And the cost, at least based on my expertise in
2  statistics, wouldn't be justified by the benefits
3  that would be derived.
4       And you can -- your experts can certainly
5  check that by going out and collecting pharmacy logs
6  from other pharmacies to see whether or not it is
7  reliable from the standpoint of predicting the
8  results you'd get from repeated samples.
9      Q.  You spoke about the stratification of your
10 sample to make sure that you were hitting the
11 various types of pharmacies.  Is that correct?
12     A.  I'm sorry.  Say that again, please.
13     Q.  I believe you discussed -- and please
14 correct me if I'm imprecise -- that in creating a
15 sample, it was not entirely random because you
16 wanted to ensure that various types of pharmacies
17 were represented.  That would make it less random
18 but much more representative of --
19     A.  That's --
20     Q.  -- the universe of pharmacies?
21     A.  That's the reference to the word
22 "stratification."
23     Q.  Your data did not include either Walgreens
24 or Rite Aid; is that correct?
25     A.  That's correct.

Page 148

1      Q.  And that's the third and first largest
2  pharmacies in the United States; is that right?
3      A.  I'd have to go back and look at the data.
4  I don't recall.
5      Q.  Taking that as true, would that have any
6  effect on the representativeness of your sample if
7  they're not included in your -- in your sample?
8      A.  Once again, this is the best available
9  data, the data that I've used.
10       If one goes out and collects a random
11 sample from Rite Aid and Walgreens, the question is:
12 Would that data show any difference?
13       To the extent the document that you just
14 showed me, namely, the most recent exhibit -- thank
15 you -- about all the independent pharmacies and
16 chain pharmacies, the argument that is advanced by
17 this particular document is that there's a huge
18 amount of access and there's a lot of competition
19 among these various pharmacies.  If that's the case,
20 the pharmacies that are included in my sample are
21 going to actually conduct themselves much the same
22 way as all other pharmacies.
23       So if you accept the argument that there's
24 a competitive structure at the pharmacy level and
25 consumer access, collecting Rite Aid and Walgreens

Page 149

1  wouldn't change my results.
2       Now, if there is some lack of competition
3  within the services provided by pharmacies, maybe it
4  would make some difference.  But even so, given the
5  question I was assigned, it's the best available
6  information that exists today.
7       For example, in urban areas -- right here,
8  using their own words:
9       ". . . consumers patronizing independents
10      have access to 30 competing pharmacies
11      within two miles of their current
12      pharmacy."
13       What that says is that there's a
14 competitive landscape, and they're all going to
15 provide services charging, in effect, the same value
16 for their services.  If they get out of line,
17 consumers are going to go to where the best services
18 are for the costs that they incur.
19     Q.  I believe you derive your conclusion
20 regarding a significant number of third-party
21 payers.  Unfortunately, I can't seem to find the
22 page that you say that on.
23       Page 21.  Your opinion here is that:
24       "The economic evidence shows that in
25      the period from December 2002 through

Page 154

1  third-party payers who paid for a PPI or who just
2  paid for Nexium?
3      A.   Who paid for Nexium, yes.
4      Q.   So if a third-party payer paid for a lot
5  of Protonix but no Nexium, they wouldn't show up on
6  your data set?
7      A.   That's correct, because they would be
8  outside of the purpose for the analysis that I
9  conducted.
10     Q.   And then you took the 20 third-party
11 payers who had the largest shares of Nexium sales.
12 So you identified those 20?
13     A.   Yes.
14     Q.   And then you were only able to obtain
15 rebate data for 14 of them; is that correct?
16     A.   That is correct.  That's clarified at the
17 top of page 22.
18     Q.   Yes.  Did AstraZeneca not have rebate data
19 for six of these third-party payers?  Is that what
20 happened?
21     A.   There wasn't any data with regard to a
22 subset of the third-party payers.
23     Q.   Is it possible that AstraZeneca simply
24 wasn't paying rebates to them?
25     A.   Certainly it's possible.  It's possible

Page 155

1  that Nexium wasn't on their formulary too.
2      Q.   But they did cover -- they were one of the
3  20 third-party payers responsible for the largest
4  share of Nexium?
5      A.   Yes.  But now the question is the data
6  itself.  What does the data itself show with regard
7  to matching up that data with regard to
8  AstraZeneca's reported contractual relationships
9  with third-party payers and what they paid them in
10 the way of rebates?
11     Q.   AstraZeneca didn't have contractual
12 relationships with every third-party payer, is that
13 correct, for Nexium?
14     A.   I don't believe they did, no.  But in
15 terms of looking at the universe of all potential
16 and what their contracts were, I didn't go through a
17 matching process.  I simply looked at what these
18 third-party payers that appeared on the transaction
19 and whether there was any rebates offered to them.
20     Q.   So when you calculate the cost to
21 third-party payers, you exclude six of the 20 top
22 third-party payers when it comes to the proportion
23 of Nexium purchases on the basis that you didn't see
24 that AstraZeneca had given them any rebates?
25     A.   I don't have any rebate data for it, so I

Page 156

1  can't very well look at the actual incentives with
2  regard to those third-party payers.
3          What I'm concerned about and the purpose
4  for my analysis is to look at how the world's going
5  to change if there is a new generic that is
6  introduced to the market.  What is going to happen
7  to AstraZeneca with regard to the amount of
8  compensation they're going to have to offer to the
9  managed care for which they're offering rebates,
10 whether there's any incremental -- or the incentives
11 for incremental rebates to be offered to them.  And
12 I only used those actual observations for which
13 there was rebate data that was available.
14     Q.   So your conclusions about the relative
15 cost of Nexium versus generic omeprazole are limited
16 to the cost to third parties with whom AstraZeneca
17 was in a contractual relationship, offering rebates?
18     A.   Yes, because that would go to the question
19 of would that equilibrium that existed prior to the
20 hypothetical negotiation, would that equilibrium be
21 changed as a result of a new entrant and a lower
22 cost, a lower potential cost of omeprazole, which
23 would in turn, in the new equilibrium, require one
24 of two things:  either less volume being moved
25 through the market or more rebates being offered?

Page 157

1      Q.   So the calculation you run on the cost to
2  third-party payers of Nexium is not representative
3  even of all of the 30 -- I'm sorry -- of the 20
4  third-party payers who were responsible for the
5  largest share of Nexium sales because you exclude
6  any third-party payer who did not receive a rebate.
7          And as a result, wouldn't that
8  significantly change your results?
9      A.   Why?  It doesn't change my results for the
10 purposes for which I conducted the analysis.
11         The purpose of the analysis is for those
12 third-party payers that receive some incentive for
13 moving volume, and the incentive is rebates, and
14 would that equilibrium change as a result of a new
15 generic being on the marketplace?  That's the
16 purpose for the analysis.
17         You can ask all sorts of questions talking
18 about general purposes or other purposes that might
19 arise that you would be interested in.  But those
20 are not the purposes for which I did my analysis.  I
21 specify quite clearly what my purpose was.
22         So given my purpose, a third-party payer
23 that is getting nothing in the way of incentives
24 from Nexium is not relevant to my analysis.
25     Q.   Is there anything stopping AstraZeneca

Page 158

1    from entering into contractual relationships with
2    those six third-party payers that are not included
3    in your sample?  Is there any reason that they could
4    not enter into that sort of relationship?
5        A.  In the future?
6        Q.  Yes.
7        A.  Depending on what the incentives are,
8    certainly it's possible.
9        Q.  And just looking at the last sentence in
10   paragraph 41, you note that not all of these payers
11   were present in the pharmacy logs for both states,
12   reflecting that health plans are often regional in
13   nature.  Is that correct?
14       A.  Yes, that's what the sentence says.  Some
15   health plans were regional; some are national.
16   Certainly.
17       Q.  Okay.  And does that give you any pause
18   with regard to the representativeness of these 30
19   pharmacies from two states to represent the entire
20   United States?
21       A.  No, not with regard to, No. 1, the
22   purposes for my analysis; and No. 2, what is the
23   best available information.
24           Is there any information out there that's
25   better than this information with regard to drawing

Page 159

1    inferences for the entire United States?  I'm not
2    aware of it.
3        Q.  In paragraph 42, but over on page 23 --
4    it's the end of the paragraph -- you note that:
5            "For several of the top 14 third party
6            payers, there were no months where there
7            was pharmacy log data for both drugs under
8            comparison, and these third party payers
9            were removed from the tables."
10           How many of those -- how many of the 14
11   were removed from the data?
12       A.  I have to go back and look.  I'm sorry.  I
13   don't have that memorized, although I think you can
14   infer that by looking at the blank cells that appear
15   in the tables and thus it wasn't possible for those
16   third-party payers to compute a difference.
17           And I think that's -- in the documents I
18   produced along with my report, that question can be
19   answered.  I just don't have it memorized.  If we
20   went through and counted all of the blank cells that
21   appear, there wouldn't be the basis for making the
22   comparison because they didn't reimburse for both
23   omeprazole and Nexium in that particular month.
24       Q.  Okay.  And just to clarify, when you say
25   that those third-party payers were removed from the

Page 160

1    tables, you don't mean that they were removed from
2    the figure; you just mean that that particular month
3    was blank?
4        A.  Yeah.  But if it turns out that there were
5    no months for that third-party payer, then that
6    third -- nothing would appear with regard to that
7    third-party payer because it wouldn't be possible to
8    compute a difference for any month.
9        Q.  Your Figures 8 and 9 on page 24 list nine
10   30 party -- excuse me -- list nine third-party
11   payers; is that correct?
12       A.  For California, yes.
13       Q.  And then --
14       A.  That's only for California, remember.
15       Q.  Oh, okay.
16       A.  I presume you've read the report.  We're
17   now talking just about California.  Later I give you
18   the third-party payers for Massachusetts, on
19   pages 27, 28, 29.
20       Q.  Okay.  And that also includes nine, but
21   they're not all the same; hence adding up to the 14
22   payers that you have?
23       A.  There you go.  We got it.
24       Q.  Always good to make everything make sense.
25       A.  You should tell Mr. Weinstein the same

Page 161

1    thing.
2        Q.  Did you ever calculate a margin of error
3    or a confidence interval for the data that you
4    collected and the analysis you produced?
5        A.  I certainly looked at that with regard to
6    the distribution.  I reported here the median
7    differences.  Is that your point?
8            Did I look at the entire distribution
9    around that median?  Obviously, half the
10   distribution is above and half is below.  Otherwise,
11   it wouldn't be a median.  I also computed the mean.
12   I looked at the distribution itself, found that it
13   was basically symmetric.  As I say, there's not much
14   difference at all between the mean and the median.
15           And with regard to your question:  Did I
16   compute a confidence interval?  No.  But could a
17   confidence interval be computed?  Yes.  And would
18   the difference here with regard to after taking into
19   account DACON, manufacturer rebates and co-pays,
20   would it be significant as a difference?  Yes.
21           But did I do that and report an actual
22   computed confidence interval?  No.
23       Q.  In reviewing the tables that you have
24   starting on page 24, so Figures 8, 9, 10, 11, 12,
25   13, 14 and 15, those are the tables that -- that

Case 1:01-cv-09351-DLC   Document 188-1   Filed 09/20/13   Page 19 of 30

ASTRAZENECA AB vs. APOTEX                                      Job 15216
Gordon Rausser Confidential                              Pages 162..165

Page 162

1  cover the comparisons you drew in California and
2  Massachusetts; is that correct?
3      A.  Yes.
4      Q.  Just to get back -- sorry -- to the point
5  we made before about the confidence interval, have
6  you determined what confidence interval would show
7  that price difference is significant?
8      A.  I didn't compute the confidence interval.
9  I just told you that.
10     Q.  Do you have --
11     A.  I mean, I looked --
12     Q.  -- as an expert --
13     A.  I looked at the actual distributions, and
14  the distributions, as I indicated, were symmetric.
15  Not in all cases, but pretty close.  And given the
16  size of the sample, if I had formally tested, I
17  would have found they were statistically significant
18  at a sufficient level of confidence.
19     Q.  Getting back to the figures -- sorry --
20  I've just listed -- and I realize I interrupted
21  that -- but the figures running from page 24 through
22  29.
23     A.  24.  I'm sorry.  Is there a question?
24     Q.  Oh, I'm sorry.  I just wanted you to take
25  a look at them.

Page 163

1      A.  Okay.
2      Q.  There are -- I believe we've previously
3  discussed that you would leave a cell blank when
4  there was no pharmacy log data for both Nexium and
5  generic omeprazole.
6      A.  For that third-party payer in that month.
7      Q.  Right.
8      A.  Right.
9      Q.  And so that's why there'd be a blank cell?
10     A.  Yes.
11     Q.  There are several third-party payers here,
12  notably Prime Therapeutics in California --
13     A.  Yes.
14     Q.  -- and Walgreens Health Initiatives, also
15  in California --
16     A.  Yes.
17     Q.  -- UnitedHealthcare and First Health Group
18  in Massachusetts, as well as Anthem in
19  Massachusetts, that have many more blank cells than
20  numbers.
21     A.  That is correct.
22     Q.  Does that in any way concern you with
23  regard to their usefulness in this sample?
24     A.  Their usefulness?  I'm looking at the
25  overall.  With regard to any statistical

Page 164

1  significance, I'm not looking at it specifically
2  with regard to any third-party payer but across all
3  third-party payers.  And my analysis and the purpose
4  for my analysis is to look at it for all third-party
5  payers.
6          My assignment and the question that I'm
7  analyzing doesn't require me to look at it for a
8  specific third-party payer.
9          So am I concerned?  Would I have preferred
10  to have all the cells filled?  Certainly I would
11  have, but that's not what the data shows.
12     Q.  Is there -- do you know whether you don't
13  have the data because there was a problem in the
14  underlying data, or if it was just that this
15  third-party payer simply did not cover anyone who
16  was purchasing one of the products or both of the
17  products in that month?
18     A.  You're asking me for the underlying
19  explanation for why a cell doesn't -- or a
20  particular month for a particular third-party payer
21  doesn't allow a comparison.
22          No, I didn't go back and try to unravel
23  why there was no comparison.  I simply looked at the
24  data and what the data says.
25          There was no reason, given I was concerned

Page 165

1  about the overall universe with regard to the
2  pharmacy logs and all third-party payers, to unravel
3  why, for example, Prime Therapeutics, in the case of
4  California for the month of December '02, didn't
5  actually provide reimbursements for both Nexium and
6  omeprazole.  No, I didn't.
7      Q.  Okay.  Okay.  If you could look at
8  page 19, Footnote 14.
9      A.  Footnote 14, you said?
10     Q.  Mm-hmm.
11     A.  Yes.
12     Q.  Okay.
13     A.  I'm there.
14     Q.  So this is your description of the
15  pharmacy log data and where it came from; is that
16  right?  Or --
17     A.  A partial description.
18     Q.  Partial description?
19     A.  The text itself provides a description as
20  well, but this provides some additional detail.
21     Q.  Okay.  In the third paragraph in this
22  footnote, it begins:
23          "There was a considerable amount of
24          irregularity in the raw pharmacy log data.
25          For certain transactions, key data was

Page 166

1       missing, and for others, the data was
2       obviously entered incorrectly, so these
3       transactions were eliminated from my
4       analysis. The pharmacies used different
5       conventions for naming third party payers,
6       so these names had to be standardized
7       through considerable effort. Data fields
8       were sometimes ambiguously labeled, and as
9       a result the calculation of third party
10      payments was achieved only after extensive
11      data analysis and multiple communications
12      with the pharmacies."
13      Is that correct?
14      A.  That is correct.
15      Q.  Do you have any concerns for the accuracy
16  of all this underlying data that you've used?
17      A.  No. In all data, there are outliers;
18  there are measurement errors; there is incorrect
19  reporting. And I'm not surprised that this raw data
20  with regard to pharmacy logs suffers from the same
21  sort of anomalies. I took into account those
22  anomalies and eliminated those transactions.
23      The relevant question is: What percentage
24  of the transactions do these represent? And they're
25  a very small percentage. My recollection is

Page 167

1   something in the neighborhood of 2 to 3 percent of
2   all transactions.
3       That's not surprising. Most statistical
4   methodologies that are out there for identifying
5   outliers would exclude that amount of transactions
6   for large data sets of this type.
7       Q.  But you did not feel the need to go back
8   and determine whether there was underlying data
9   problems to explain why the 14 payers that you end
10  up looking at, why some of them had so few months
11  with relevant data?
12      A.  They didn't have a comparison. They had
13  data, but there was no comparison. You can't do a
14  comparison unless you have observations for each of
15  the two drugs.
16      Now, they were -- for example, in many of
17  these cases where there are blank cells, they were
18  reimbursing for one, but not the other. So that
19  shouldn't surprise us.
20      And moreover, I would point out to you
21  that there was a lot of work done by going back to
22  the pharmacies and communicating directly with them
23  to resolve any anomalies that existed in the data.
24  And some of it, it could be resolved; and in other
25  cases, it couldn't.

Page 168

1       Q.  Looking at page 13 of your report,
2   paragraph 24.
3       A.  Page 13? Yes.
4       Q.  All right. You note that:
5       "Individualized discounts and rebates
6       are negotiated at many intersections of
7       this flow chart, which makes actual
8       pharmaceutical prices highly variable."
9       Is that correct?
10      A.  Yes.
11      Q.  And you do consider that pharmaceutical
12  prices are highly variable?
13      A.  Yes.
14      Q.  And do you agree with the Kaiser Family
15  Foundation study that you quote, where you say --
16  I'm sorry -- where they say that ". . . substantial
17  variations in what different purchasers pay for the
18  same drug"?
19      There are substantial variations. I'm
20  sorry. It's the second sentence of the quote.
21      A.  Thank you. Yes, I agree with that. Yes,
22  certainly.
23      Q.  And we've already discussed your comment
24  on paragraph 41 of your report, saying that health
25  plans are often regional in nature; is that correct?

Page 169

1   And you stand by that?
2       A.  Health -- some health plans are regional
3   in nature, and some are not. Yes, I stand by that
4   as well.
5       Q.  And taking into account that
6   pharmaceutical prices are highly variable, that some
7   health plans are regional, that you were only
8   depending on 20 third-party payers pulled from 30
9   pharmacies in two states, you're still comfortable
10  with your conclusion that if omeprazole was more
11  expensive than Nexium for many third-party payers in
12  November 2003, that would have helped shape
13  AstraZeneca's motivation in the negotiation?
14      A.  Yes, indeed. Once again, it's the best
15  available information. And there's no question that
16  AstraZeneca was very aggressive with regard to their
17  rebating and attempting to move volume of Nexium
18  through the market. And they could only achieve
19  that by maintaining similar sorts of incentives for
20  third-party payers relative to the generics that
21  were out in the marketplace at that point in time.
22      And moreover, any other prices that are
23  available with regard to non-primary transaction
24  prices that are reported in this industry, the
25  average wholesale price, the WAC price, the fact

Page 170

1  that no MAC had been established, even though there
2  was references and expectations that there might be
3  a MAC established somewhere along the line, those
4  prices already show great similarity between the
5  generic omeprazole that existed, even though three
6  generics were out on the marketplace as of
7  November 2003 and they kept their prices very high
8  relative to the Nexium price.
9         And that's the gross price. When you take
10  into account the net prices, there's even more
11  incentive for moving Nexium volume.
12        So, yes, there's no question that these
13  results demonstrate that part of the success with
14  regard to the market penetration of Nexium was, in
15  fact, the incentives that Nexium offered to
16  third-party payers and that the generics kept their
17  prices very high.
18        MS. KINBURN: I think this would be a good
19  time to take a break.
20        THE VIDEOGRAPHER: We're now going off the
21  record, and the time is 3:27.
22        (Recess taken.)
23        THE VIDEOGRAPHER: We are now back on the
24  record, and the time is 3:32.
25

Page 171

1  BY MS. KINBURN:
2     Q.  Dr. Rausser, I believe you've mentioned
3  the topic of switching between various PPIs.
4         If you could take a look at page 13 of
5  your California declaration, which I believe is now
6  Exhibit 11.
7     A.  Yes.
8     Q.  And in this declaration, you note that --
9  I'm sorry -- on paragraph 23, right after the
10  redaction, data from NDCHealth confirms, I guess the
11  previous testimony.
12        "It indicates that, in the average
13        month in 2003, 5.4 percent of Nexium
14        patients had just switched from another
15        PPI."
16  And then you say that:
17        "The percentages for other branded PPIs
18        are similar."
19  Is that correct?
20     A.  Yes.
21     Q.  And you say:
22        "Omeprazole's percentage (15.7 percent)
23        is higher, mostly because it had recently
24        launched."
25        Is that right?

Page 172

1     A.  Yes.
2     Q.  And you say that:
3        "The switching is fairly evenly
4        distributed among different PPIs."
5     A.  Yes.
6     Q.  And then you have a footnote, Footnote 12.
7  And in that footnote, you compare the number -- the
8  patients who switched to Nexium from another PPI to
9  the patients who switched away from Nexium to
10  another PPI. Is that correct?
11     A.  Bear with me one second. It's been some
12  time since I read this.
13        Yes, that is correct.
14     Q.  And if you look at the number of patients
15  who switched to Nexium from another PPI, the data --
16     A.  To Nexium, the first --
17     Q.  Yes.
18     A.  -- category?
19     Q.  To Nexium.
20     A.  Yes.
21     Q.  The percentage of patients who switch --
22  excuse me -- switched to Nix- -- switched to Nexium
23  from another PPI where that other PPI is omeprazole
24  was 16.2 percent --
25     A.  Yes.

Page 173

1     Q.  -- of the patients that were coming to
2  Nexium?
3     A.  Yes.
4     Q.  And, in fact, most or, I guess, the
5  largest share of patients coming to Nexium came from
6  Prevacid. Is that correct?
7     A.  Yes.
8     Q.  And that was 34.8 percent of the new
9  patients that were switching over --
10     A.  Yes.
11     Q.  -- came from Prevacid?
12        And then you also, in the next sentence,
13  go on to determine the percentages of patients who
14  switched away from Nexium to another PPI. And in
15  that, you find that 19 percent or 19.1 percent of
16  patients switching away from Nexium to another PPI
17  switched to generic omeprazole; is that correct?
18     A.  That is correct.
19     Q.  25.7 percent of that population, that
20  patient population switched to Protonix; is that
21  correct?
22     A.  Yes.
23     Q.  And 32.4 percent to Prevacid?
24     A.  Yes.
25     Q.  I believe we discussed earlier in this

Page 174

1  deposition the fact that Nexium sold itself largely
2  on its efficacy.  That was its marketing drive, was
3  that it was the best product.
4      A.  I don't -- going back to their actual
5  marketing material, my recollection is they compared
6  their efficacy relative to Prilosec.
7          And in terms of the education of the
8  market, whether it is informative advertising and
9  promotion or persuasive advertising and promotion,
10  previously they had represented that Prilosec was
11  superior to other PPIs.  So given fundamental logic,
12  if Prilosec was superior to the other PPIs at the
13  time and then Nexium comes along and is superior to
14  Prilosec, you can infer that what they were hoping
15  the market would believe is that Nexium was superior
16  to all other PPIs.
17          Now, there are a lot of P&T committees and
18  there are lots of arguments that no, Nexium was
19  nothing more than Prilosec.
20      Q.  Okay.  And I believe you've also discussed
21  the fact that third-party payers would look at the
22  cost-efficacy balance.
23      A.  Yes.
24      Q.  And did you understand that AstraZeneca
25  was positioning Nexium on that cost-efficacy balance

Page 175

1  as -- this is going to be a figure of speech -- as
2  standing heavier on the efficacy as opposed to the
3  cost in comparison to the other available PPIs?
4      A.  No, I don't think you can infer that.  If
5  you look at what kind of rebates they were offering
6  to some of the managed care third-party payers, they
7  were focusing on cost more than they were on
8  efficacy.  I mean, but it depends on who the -- who
9  the third-party payer or managed care facility they
10  are negotiating with, but I don't think you can
11  represent that in all instances they were weighting
12  their marketing effort just on efficacy.  That's not
13  true.  It was also weighted on cost.  There's no
14  question about it.
15          Given their rebating structure and if you
16  look at their financial statements, they were
17  offering more in the way of incentives for discounts
18  against gross prices than I think any other
19  manufacturing branded pharmaceutical company out
20  there.  Any one of the majors.  Not any one, but the
21  majors.
22          I've certainly looked at the data with
23  regard to all the majors; Novartis, for example, or
24  Pfizer.  And it turns out if you look across the
25  entire portfolio, much of which is driven by Nexium,

Page 176

1  given how important it is for AstraZeneca, they were
2  offering the largest discounts to the marketplace.
3      Q.  The largest discounts from the WAC, but
4  not the lowest WAC?
5      A.  I would have to go back and look at
6  whether they had the lowest WAC or not.  But I'm not
7  talking about WAC.  I'm talking about the gross --
8  whatever the gross price was that is reported by
9  AstraZeneca or IMS.
10          Against that gross price, they were
11  offering the largest deductions against that price,
12  whether the deductions are reflected in rebates or
13  chargebacks or returned product or free samples,
14  whatever.
15      Q.  But the final cost has to reflect both the
16  gross price and also the rebate.  So if Nexium
17  offered the biggest rebate but was twice as
18  expensive before the rebate, you need to consider
19  both of those factors in determining its relative
20  cost?
21      A.  That's why, if you look in my report, when
22  I give you the five factors, I start with what is
23  the reimbursable value of the transaction.
24      Q.  Okay.  Can you take a look at what was
25  marked as Exhibit 5, which is the Graham deposition

Page 177

1  transcript from May 31st, and take a look at
2  page 147 --
3      A.  Exhibit 5?
4      Q.  -- to 148.
5      A.  I'm sorry.  What is Exhibit --
6      Q.  It may be to your --
7      A.  Left?
8      Q.  -- to your left.
9      A.  Oh.  Thank you.
10      Q.  On pages 147 to 148.
11      A.  147 to 148.
12      Q.  No, I'm sorry.  Just 148.
13      A.  Just 148.
14      Q.  It's in the lower right-hand corner.
15          All right.  Do you see where -- it's the
16  first full paragraph on 148.  Graham says:
17          "As we discussed earlier, Protonix and
18          Prevacid had a lot of low cost, cost
19          sensitive customers that Nexium didn't
20          have."
21      A.  This is at the top of page 48?  Oh, the
22  second paragraph.  I see.
23      Q.  Yes.
24      A.  I see.
25          Yes.

Page 202

1      We're now going off the record, and the
2  time is 4:23.
3      (Recess taken.)
4      THE VIDEOGRAPHER:  This marks the
5  beginning of Tape No. 4 in the video deposition of
6  Gordon Rausser.  We are back on the record at 4:33.
7  BY MS. KINBURN:
8      Q.  So looking at page 3 of Exhibit 18 --
9      A.  Yes.
10     Q.  -- do you see in the second bullet point
11 that it says "Nexium lost an estimated 3 percent of
12 its volume to Prilosec OTC"?
13     A.  Yes.
14     Q.  Do you disagree with that finding?
15     A.  Not based on the data that they're looking
16 at.  They've got household data, and it's a fairly
17 large number of households.  I haven't done an
18 analysis, nor do they in this report do an analysis
19 about the reliability of any inferences for the
20 entire marketplace.
21     MS. KINBURN:  Okay.  And then I'd like to
22 mark this as Exhibit 19.
23     (Whereupon, Deposition Exhibit 19 was
24 marked for identification.)
25     MS. KINBURN:  For the record, this is AZD

Page 203

1  166463.
2  BY MS. KINBURN:
3      Q.  And once again, you can review this at
4  your leisure, though, I would like to direct your
5  attention, though, to pages 12 -- page 12 of the
6  report, which is 474.
7      A.  Fourth quarter 2004.
8      Okay.  Your question?
9      Q.  So looking at page 12 --
10     A.  12.
11     Q.  Oh, and just for the record, this is a
12 Nexium fourth quarter 2004 performance review dated
13 January 11th, 2005, and it was an AstraZeneca
14 document, created by them.
15     A.  Yes.
16     Q.  All right.  So if you look at the title --
17 sorry -- of the slide that you see, it says:
18         "POTC" --
19         Which I would assume is Prilosec OTC.
20     A.  Yes.
21     Q.  -- "Impacted Nexium EU volume by about
22         4 percent since September '03."
23         Do you see that?
24     A.  I do.
25     Q.  And do you see the graph below that title?

Page 204

1      A.  I do.
2      Q.  And if you look at the second paragraph,
3  last sentence of that paragraph below this slide,
4  he's -- the person writing the report says:
5         "Using this methodology, I estimate
6         that POTC has slowed Nexium EU volume by
7         about 4 percent.
8         Do you see that?
9      A.  I do.
10     Q.  Okay.  And do you have reason to disagree
11 with this analysis?
12     A.  Yes.  I completely disagree with this
13 analysis.
14     Q.  Okay.  And why would that be?
15     A.  For a number of reasons.  First of all,
16 they're attributing all of the change in the trend
17 to POTC, and they've done no analysis to separate
18 other possible causal influences.  That's number
19 one.
20         Number two, the 4 percent is off a linear
21 line that they've drawn through the data points.
22 Now, first of all, I don't think that is an actual
23 minimize -- minimization of the error of sums of
24 squares.
25         Number three, you'll look at the actual

Page 205

1  Nexium; it continues to rise over the period that
2  they infer that there's a 4 percent cumulative
3  impact.  That cumulative impact is against the
4  linear line.  But if you look at the actual rate of
5  growth over the period that's reported here,
6  namely -- what is it? -- September '03 through
7  November of '04, in the year '04 there is an
8  increase in the number of extended units.
9         They have done no analysis to be able to
10 demonstrate that this is all attributed to
11 Prilosec OTC.  And I disagree with it completely.
12 This would never pass peer review standards.
13     Q.  Turning back to your report, paragraph 11.
14     A.  Yes.
15     Q.  In about the middle of the paragraph, you
16 say in a parenthetical:
17         "These buyers' influence over the
18         choice of drug used is described in
19         greater detail in the declaration
20         submitted in this case by Robert
21         P. Navarro, Pharm.D."
22         Do you see that?
23     A.  Mm-hmm, yes.
24     Q.  And do you rely on that report to
25 establish any of the -- or to base any of the

ASTRAZENECA AB vs. APOTEX
Gordon Rausser Confidential

Job 15216
Pages 206..209

Page 206

1  conclusions in your report?
2      A.  No.  I'm simply giving a source where you
3  can find a discussion of third-party payers'
4  influence and/or control over the volume being moved
5  through the market.
6          It's also based on the 40 to 60 or so
7  drugs and markets that I have analyzed over the
8  years, including all of the branded pharmaceutical
9  data that I had direct access to in the branded --
10  Brand Name Antitrust Litigation.
11      Q.  Okay.  So if Navarro's opinion was
12  excluded, that would have no effect on your
13  opinions?
14      A.  That's correct.
15      Q.  Looking at the next paragraph of your
16  report -- actually, no.  Staying with the last
17  sentence of paragraph 11, so it's on page 6, you
18  comment that:
19          "Loss of this advantage" -- this
20          advantage being Nexium's lower cost to
21          third-party payers -- "could have
22          threatened Nexium's favorable formulary
23          status and its market share."
24          Is that correct?
25      A.  Yes, that is correct.

Page 207

1      Q.  And then based on that, you move to
2  paragraph 12 and you state that:
3          "Knowing this at the time of the
4          hypothetical negotiation, AstraZeneca
5          would have had an economic interest in
6          maintaining omeprazole's higher cost to
7          third party payers relative to Nexium.
8          This would have created an incentive for
9          AstraZeneca to prevent the launch of an
10          additional generic version of omeprazole."
11          Do you see that?
12      A.  I do.
13      Q.  Okay.  And so is the conclusion in
14  paragraph 12 about AstraZeneca's incentives based on
15  your opinion in paragraph 11 about the potential
16  loss of Nexium's cost advantage?
17      A.  In part, yes.
18      Q.  All right.  Aside from your analysis of
19  Nexium's net cost, what else are you basing that
20  conclusion in paragraph 12 on?
21      A.  All the work that I've done in the
22  pharmaceutical industry with regard to dynamic
23  interactions between the brand drug, a subsequent
24  drug that serves the same indications, the generic
25  competition, what happened in this marketplace with

Page 208

1  regard to maintaining and keeping at a relatively
2  high level the generic pricing that existed up to
3  November of '03, how close the actual pricing was of
4  the other generic forms of Prilosec, omeprazole that
5  were out in the marketplace.
6          And this goes to the data that is
7  described in Figure 3 and Figure 4 of my report and
8  the host of documents that were produced by
9  AstraZeneca, the deposition testimony of Mr. Graham
10  that you asked me about earlier, the actual
11  deposition that I referred to with regard to
12  Mr. Uhlich with regard to the so-called -- Uhle,
13  Uhle -- the so-called halo effect.
14      Q.  Just taking a look through your report, it
15  appears that starting on page 9 --
16      A.  Page 9?
17      Q.  -- under the heading "The Price of a PPI"
18  through the rest of the text of your report
19  concentrates solely on establishing how to
20  establish -- establishing how to calculate a net
21  cost for a drug and then applying that calculation
22  to understand the net costs of Nexium and generic
23  omeprazole.  Is that correct?
24      A.  Yeah.  The real price of therapy, that is
25  correct.

Page 209

1      Q.  So where in your report have you discussed
2  or established the rest of these bases for your
3  opinion that you just listed to me?
4      A.  Well, first of all, some of the deposition
5  testimony that I referred to was not available.  The
6  one was, but I didn't review that until after filing
7  my report.
8          My assignment, as I specified in my
9  report, was very narrow.  It was just looking at the
10  relative costs and then analyzing, from an economic
11  perspective, what was the interest of AstraZeneca in
12  any hypothetical negotiation.
13          The deposition by Mr. Graham was not
14  available to me until after filing my initial
15  report.  The opposing expert reports that have been
16  filed and the documents that they relied upon; I
17  went back and looked at all the documents that were
18  produced by AstraZeneca in the normal course of
19  their business, much of which I was already familiar
20  with because of my prior work in the Nexium class
21  litigation; and moreover, the body of work that I've
22  done in the pharmaceutical industry over the last 22
23  years.
24      Q.  So those were all the things which you
25  would now rely on in explaining your opinion, but

Page 210

1  they're not in your report itself, are they?
2      A.  Yeah, they're in my report.
3          The minimal amount of information with
4  regard to IMS is in my report.  The data on the
5  average wholesale price, the WAC is in my report.
6  All of the pharmacy log data's in my report.
7          And my expertise with regard to the
8  pharmaceutical industry in terms of the summary of
9  my opinions in paragraphs 11 and 12, I presume
10  that's what this deposition is for, is to determine
11  what my basis is for the conclusions that I've
12  drawn.  And your questions have pointed us in the
13  direction of what that foundation is.  I've provided
14  it.
15      Q.  So based on your expertise in the
16  pharmaceutical industry and your review of the
17  market data for generic omeprazole, did you come to
18  any conclusions as to the extent of and the likely
19  trend of omeprazole -- strike that question.
20  Started well and then it ended poorly.
21      A.  It did start well.  I thought I knew where
22  you were going, and then I got confused.
23      Q.  So did I.
24          All right.  So relying on your expertise
25  and your review of the data with regard to the

Page 211

1  omeprazole market, the PPI market, are you able to
2  tease out or to separate the effect of the generic
3  entrants and the entrants of Prilosec OTC before
4  Apotex and determine what effect -- what . . .
5      A.  What effect it had on the interest of
6  AstraZeneca with regard to Nexium?
7      Q.  What effect that would have on the price
8  of generic omeprazole if Apotex had not launched.
9      A.  Oh.  Can I see if I can restate the
10  question?
11      Q.  Yes, please do.
12      A.  Okay.  In other words, I've analyzed the
13  data with regard to omeprazole and the three generic
14  manufacturers that were out there up through
15  November '03.
16          Is your question then, did I analyze the
17  counterfactual of what would happened to those
18  prices going forward if Apotex hadn't entered?
19      Q.  Or based on your expertise, could you give
20  me your opinion as to what would have happened?
21      A.  Well, up to that point in time, I can
22  represent to you what happened up to that point in
23  time.  Namely, there was an equilibrium that had
24  been forged that kept the generic pricing very high
25  and very close to Nexium and, for many third-party

Page 212

1  payers, a preferred cost incentive for Nexium
2  relative to those generics.
3          If your question is "Would that have
4  equilibrium continued in the counterfactual world in
5  which Apotex hadn't entered the market?" all the
6  evidence I've seen is that they had reached an
7  equilibrium.  That equilibrium was going to be
8  disturbed by a generic entrant.  Would it be exactly
9  the same as it was in 2003?  No, because there are
10  other generics that subsequently took -- entered the
11  market.  There were other OTC products.  Prevacid,
12  for example, for an illustrative purpose, has an OTC
13  product.  So those would all have some effect on the
14  market dynamics down the road.
15          I haven't formally analyzed that
16  counterfactual, but I can represent that coming into
17  November of '03, that there was, in fact, a
18  stationary equilibrium that had emerged and,
19  moreover, that stationary equilibrium had benefited
20  Nexium.  And Nexium was capturing a lot of value in
21  the marketplace at that point in time.
22          And I would expect, and now I'm not
23  talking about the counterfactual world but the
24  actual world, with regard to another generic coming
25  in, and the other generic could only achieve success

Page 213

1  by price competition, only by price competition.
2  And as a result, that would disturb the prior
3  equilibrium and result in a less favorable position
4  with regard to Nexium in the marketplace.
5      Q.  Okay.  Were you aware of the production
6  constraints on generic omeprazole in the first eight
7  or nine months of 2003?
8      A.  Yes.  There's reference in the discovery
9  record to the first generic facing capacity
10  constraints, yes.  And that would have had quite --
11  as you would expect, would have had an effect on the
12  penetration of that generic with regard to, one,
13  pursuing more aggressive pricing strategies; and
14  two, also being able to convert Prilosec, now,
15  through a number of different mechanisms, one of
16  which is very important is the automatic
17  substitution.
18          But if it turns out that prescriptions
19  that were previously written for Prilosec are now
20  written for Nexium, that automatic substitution
21  wouldn't work anyway.
22      Q.  Okay.  So given the supply constraints,
23  could that have created this equilibrium that you
24  noticed before Apotex's entry?
25      A.  Yes.  But that equilibrium, at least with

ASTRAZENECA AB vs. APOTEX
Gordon Rausser Confidential

Job 15216
Pages 218..220

Page 218

```
1              CHANGES AND SIGNATURE
2
3   WITNESS:  GORDON C. RAUSSER, Ph.D.
4   DEPO DATE:  8/9/13
5   PAGE  LINE      CHANGE           REASON
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19       _____
20       _____
21       _____
22       _____
23       _____
24       _____
25       _____
```

Page 219

```
1        I, GORDON C. RAUSSER, Ph.D., have read the
    foregoing deposition and hereby affix my signature
2   that same is true and correct, except as noted
    above.
3
4               _____
5                  GORDON C. RAUSSER, Ph.D.
6
7   THE STATE OF _____)
    COUNTY OF _____)
8
9        Before me, _____,
    on this day personally appeared GORDON C. RAUSSER,
10  Ph.D., known to me (or proved to me under oath or
    through _____) (description of identity
11  card or other document) to be the person whose name
    is subscribed to the foregoing instrument and
12  acknowledged to me that they executed the same for
    the purposes and consideration therein expressed.
13       Given under my hand and seal of office
    this _____ day of _____ ,
14  20 ____.
15       _____
16       Notary Public in and for
         the State of _____
17       Commission Expires:  _____
18
19
20
21
22
23
24
25
```

Page 220

```
1           CERTIFICATE OF REPORTER
2        I, the undersigned, a Certified Shorthand
3   Reporter of the State of California, do hereby
4   certify:
5        That the foregoing proceedings were taken
6   before me at the time and place herein set forth;
7   that any witnesses in the foregoing proceedings,
8   prior to testifying, were placed under oath; that a
9   verbatim record of the proceedings was made by me
10  using machine shorthand which was thereafter
11  transcribed under my direction; further, that the
12  foregoing is an accurate transcription thereof.
13        Further, that if the foregoing pertains to
14  the original transcript of a deposition in a Federal
15  Case, before completion of the proceedings, review
16  of the transcript [ X ] was [  ] was not requested.
17       I further certify that I am neither
18  financially interested in the action nor a relative
19  or employee of any attorney or any of the parties.
20       IN WITNESS WHEREOF, I have this date
21  subscribed my name.
22  Dated:  8/18/2013     Ana M. Dub
23       _____
24            ANA M. DUB, CSR No. 7445
25            RPR, RMR, CRR, CCRR, CLR
```

### DEPOSITION ERRATA SHEET

**Case:**        *AstraZeneca AB v. Apotex*, Case No. 01-CIV-9351
**Witness:**     Gordon C. Rausser, Ph.D.
**Depo Date:**   August 9, 2013

| Page | Line | Correction |
| --- | --- | --- |
| 10 | 5 | Change "Sidley & Austin" to "Sidley Austin" |
| 10 | 15 | Change "Sidley & Austin" to "Sidley Austin" |
| 12 | 9 | Change "Donna" to "Dawna" |
| 22 | 12-13 | Change "the role of formularies, and the Takeda." to "the role of formularies, and the Takeda publication." |
| 41 | 15 | Change "sparse" to "parse" |
| 49 | 18 | Change "a specific managed care?" to "a specific managed care organization?" |
| 58 | 8 | Change "PPM" to "PBM" |
| 75 | 2 | Change "Yes" to "No, I said well below 20%" |
| 77 | 1 | Change "or was it available" to "nor was it available" |
| 83 | 24 | Change "from Nexium and Prilosec" to "between Nexium and Prilosec" |
| 84 | 14 | Change "PT" to "P&T" |
| 91 | 6 | Change "samples doesn't" to "samples adjustment doesn't" |
| 92 | 21 | Change "care operate" to "care organizations operate" |
| 93 | 8 | Change "pre-authorization" to "prior authorization" |
| 94 | 12 | Change "Metamedia" to "MediMedia" |
| 133 | 13 | Change "rebates versus the co-pays versus the DACONs" to "rebates versus the DACONs versus the free samples" |
| 133 | 18-19 | Delete "I then make the correction for the co-pay;" |
| 151 | 22 | Change "other" to "others" |

| 156 | 9 | Change "managed care for" to "managed care organizations for" |
|-----|-----|---------------------------------------------------------------|
| 160 | 4 | Change "Yeah. But if it turns out" to "If it turns out" |
| 185 | 13 | Change "October" to "December" |
| 192 | 6 | Delete "No" |
| 192 | 17 | Change "that they are still" to "that there are still" |
| 197 | 25 | Change "Nexium swamp" to "Nexium sales swamp" |
| 198 | 21 | Change "there is generic entrants" to "there are generic entrants" |
| 205 | 1 | Change "Nexium; it continues" to "Nexium units; they continue" |
| 211 | 17 | Change "what would happened" to " what would have happened" |
| 212 | 3-4 | Change "'Would that have equilibrium" to "'Would that equilibrium have" |

1          I, GORDON C. RAUSSER, Ph.D., have read the
foregoing deposition and hereby affix my signature
2  that same is true and correct, except as noted
above.

3

4                           *Gordon Rausser*

5              GORDON C. RAUSSER, Ph.D.

6

7  THE STATE OF _____)
   COUNTY OF _____)

8

9          Before me, _____,
   on this day personally appeared GORDON C. RAUSSER,
10 Ph.D., known to me (or proved to me under oath or
   through _____) (description of identity
11 card or other document) to be the person whose name
   is subscribed to the foregoing instrument and
12 acknowledged to me that they executed the same for
   the purposes and consideration therein expressed.
13         Given under my hand and seal of office
   this _____ day of_____ ,
14 20 _____.

15           _____

16         Notary Public in and for
           the State of _____
17         Commission Expires: _____

18 *See attached Certificate.*

19

20

21

22

23

24

25

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Alameda_

On _9/19/2013_ before me, _John Galindo, Notary Public_,
⠀⠀⠀⠀Date⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Here Insert Name and Title of the Officer

personally appeared _Gordon Rousser_
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Name(s) of Signer(s)

_____,

JOHN ALFONSO GALINDO
Commission # 1867651
Notary Public - California
Alameda County
My Comm. Expires Oct 17, 2013

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _John _____
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Signature of Notary Public

Place Notary Seal and/or Stamp Above

──────────── **OPTIONAL** ────────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____⠀⠀⠀Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name:_____

☐ Corporate Officer — Title(s): _____
☐ Individual
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name:_____

☐ Corporate Officer — Title(s): _____
☐ Individual
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2008 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA  91313-2402 • www.NationalNotary.org⠀⠀⠀Item #5907  Reorder: Call Toll-Free 1-800-876-6827