# Appendix B

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO COURT ORDER

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
ASTRAZENECA AB, AKTIEBOLAGET
HASSLE, ASTRAZENECA LP, KBI INC.
and KBI-E INC.,

                Plaintiffs,

      vs.           Civil Action No.
                    01-CIV-9351(BSJ)
APOTEX CORP., APOTEX, INC.
and TORPHARM, INC.,

                Defendants.
-----------------------------------x Civil Action No.
IN RE OMEPRAZOLE PATENT LITIGATION   M-21-81(BSJ)
-----------------------------------x MDL Docket No. 1291

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*
       *PURSUANT TO COURT ORDER*


           August 14, 2013
             8:52 a.m.


     Videotaped deposition of ROY
WEINSTEIN, held at the offices of Sidley
Austin LLP, 787 Seventh Avenue, New York,
New York, pursuant to notice before Cary N.
Bigelow, Court Reporter, a Notary Public of
the State of New York.

Veritext Chicago Reporting Company
312-442-9087       800-248-3290      847-406-3200

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO COURT ORDER

Page 42

1  Q. And this chart records a 4 percent         09:45:52
2  decrease in Nexium extended unit volume; is that   09:45:56
3  right?                                          09:46:01
4  A. Correct.                                     09:46:01
5  Q. And that's a decrease in volume from         09:46:05
6  the trend line that was identified by the author;  09:46:08
7  is that right?                                  09:46:12
8  A. Yes, sir.                                    09:46:13
9  Q. But looking at the actual data points        09:46:14
10 of extended unit volume, the extended unit volume  09:46:19
11 for Nexium continues to increase over the entire   09:46:22
12 period of time; is that right?                  09:46:27
13 A. Well, it's not a continuous increase,        09:46:29
14 that is some months represent a decrease from the  09:46:35
15 prior month.                                    09:46:38
16    That said, on average there does appear     09:46:39
17 to be an increase in the number of extended units  09:46:50
18 over time, although that pattern is below the   09:46:54
19 trend line that one obtains based on the        09:47:04
20 experience prior to September 2003.             09:47:08
21 Q. And so in about September of 2003 the        09:47:12
22 first data point thereafter is at about 75      09:47:16
23 million extended units; is that right?          09:47:22
24 A. That's fair.                                 09:47:24

Page 43

1  Q. And then the last data point just after     09:47:25
2  November of '04, it looks like that's at about 90  09:47:30
3  million extended units; is that correct?        09:47:33
4  A. That's also correct.                        09:47:35
5  Q. And when this chart identifies the 4        09:47:38
6  percent drop it indicates that that is occurring   09:47:44
7  as of September of 2004; is that right?        09:47:50
8  A. I don't read it exactly that way. I         09:48:06
9  read the 4 percent drop as being the cumulative    09:48:08
10 impact post-September 2003 relative to the trim    09:48:11
11 line.                                           09:48:18
12 Q. Accounting for the entire time period       09:48:19
13 through November 2004; is that right?           09:48:22
14 A. That's right.                               09:48:24
15 Q. And if you just, for example, looked at     09:48:25
16 the period up through November 2003, the date of   09:48:26
17 the hypothetical negotiation, would you agree   09:48:31
18 that you wouldn't see that 4 percent impact?    09:48:36
19 A. With respect to this analysis, that's       09:48:44
20 true, you don't have enough time there.        09:48:49
21 Q. If I could have you take a look back at     09:48:53
22 your report, please, which is Exhibit 1, and in    09:48:54
23 particular paragraph 20, in subpoint A you say     09:49:04
24 that Dr. Rausser excludes transactions for sales   09:49:19

Page 44

1  of Prilosec OTC from his cost comparison        09:49:23
2  analysis; is that right?                        09:49:27
3  A. Yes.                                         09:49:28
4  Q. Now, Dr. Rausser's analysis was of the       09:49:30
5  relative prices of Nexium and omeprazole and it    09:49:33
6  began with the prices recorded in pharmacy logs;   09:49:37
7  is that correct?                                09:49:41
8  A. That's fair.                                09:49:42
9  Q. And he looked at the prices paid by         09:49:43
10 certain third-party payers for Nexium and       09:49:46
11 omeprazole as reflected in those logs between   09:49:49
12 December of '02 and November of '03; is that    09:49:53
13 right?                                          09:49:58
14 A. That's my recollection, yes, sir, for       09:49:59
15 two specific geographic areas.                 09:50:00
16 Q. Right.                                      09:50:03
17    And did you analyze those pharmacy logs?    09:50:03
18 A. I didn't go back to the original logs,      09:50:11
19 if I understand your question accurately, I    09:50:18
20 relied on Dr. Rausser's description of what he  09:50:21
21 did in his expert report rather than go back to    09:50:24
22 the original pharmacy logs.                    09:50:30
23 Q. So you don't know whether there are         09:50:36
24 instances in the pharmacy logs where a third-  09:50:39

Page 45

1  party payer was paying for all or a portion of  09:50:44
2  Prilosec OTC between the time period of        09:50:48
3  Dr. Rausser's analysis December 2002 to November  09:50:53
4  of 2003; is that right?                        09:51:00
5  A. No, that's not right.                       09:51:01
6  Q. You do know that?                           09:51:03
7  A. I think so because, if I understand         09:51:04
8  your question correctly, Dr. Rausser did a     09:51:07
9  supplemental report or an additional report in 09:51:09
10 which he described this subject matter, and I  09:51:12
11 believe in that report he indicated that he did    09:51:19
12 go back and look at the pharmacy logs either   09:51:22
13 again or had done so originally with respect to    09:51:26
14 Prilosec OTC during the period prior to the    09:51:32
15 hypothetical negotiation as well as subsequent 09:51:39
16 thereto.                                       09:51:41
17 Q. And he determined that there were no        09:51:42
18 instances where the third-party payers in his  09:51:45
19 study paid for the Prilosec OTC; is that right?    09:51:51
20 A. That's not right.                           09:51:55
21    It's right with respect to the period      09:51:56
22 prior to the hypothetical negotiation, which was   09:51:58
23 roughly a month and a half; it's not right,    09:52:00
24 according to Dr. Rausser, for the period       09:52:05

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO COURT ORDER

Page 50

1 that were in this category. 09:57:26
2  Q. You know something about copays for 09:57:29
3 prescription drugs; correct? 09:57:32
4  A. Yes. 09:57:34
5  Q. Do you think it would be typical for a 09:57:35
6 health plan at this time in 2003 to have copays 09:57:42
7 higher than $20 for all of the PPIs? 09:57:48
8  A. I don't know. 09:57:52
9  Q. You mentioned that at 71 cents per pill 09:57:56
10 that Prilosec OTC would have been the cheapest 09:58:01
11 PPI for pharmacies; is that right? 09:58:04
12  A. I did. 09:58:07
13  Q. Why does that matter? 09:58:08
14  A. Well, it matters because price matters 09:58:14
15 in this industry, as is true for most industries; 09:58:17
16 other things equal, the lower the price the 09:58:23
17 greater the sales. 09:58:27
18  Q. Does AstraZeneca sell Nexium to 09:58:28
19 pharmacies? 09:58:33
20  A. No. As far as I know, it sells to 09:58:34
21 wholesalers. 09:58:38
22  Q. So does AstraZeneca care what the 09:58:41
23 relative price is of its -- of Nexium, for 09:58:47
24 example, to other PPIs are to pharmacies? 09:58:52

Page 51

1  A. Well, not directly, it doesn't. It 09:59:01
2 cares about the relative prices to wholesalers. 09:59:03
3  Q. And why does it care about that? 09:59:10
4  A. Because other things equal, the lower 09:59:12
5 the price, the greater the sales. 09:59:15
6  Q. And what is your basis for saying that 09:59:27
7 71 cents per pill was the lowest price in the PPI 09:59:29
8 market by a wide margin? 09:59:32
9  A. I've seen comparisons done by 09:59:35
10 Dr. Rausser, bar charts, a bar chart where he has 09:59:38
11 prices of various products, including Prilosec 09:59:46
12 OTC, Nexium, Prilosec and the others. 09:59:55
13  Q. And those are WAC prices? 09:59:58
14  A. I believe so. 10:00:02
15  Q. Do uninsured consumers pay the WAC 10:00:09
16 price for drugs? 10:00:11
17  A. Not as far as I know. 10:00:14
18  Q. Do insured consumers pay the WAC price 10:00:17
19 for prescription drugs? 10:00:20
20  A. Not as far as I know. 10:00:22
21  Q. Do third-party payers pay the WAC price 10:00:24
22 for prescription drugs? 10:00:28
23  A. They might. 10:00:40
24  Q. What's your basis for saying that? 10:00:41

Page 52

1  A. My general understanding. 10:00:44
2  Q. Can you describe for me an instance 10:00:48
3 where a third-party payer pays the WAC price for 10:00:50
4 a prescription drug? 10:00:54
5  A. I can't. 10:00:56
6  Q. Other than the comparisons you've seen 10:00:57
7 done by Dr. Rausser, do you have any other basis 10:01:01
8 for your statement that Prilosec OTC at 71 cents 10:01:05
9 per pill was the lowest price in the PPI market 10:01:10
10 by a wide margin? 10:01:13
11  A. I don't. 10:01:14
12  Q. Do pharmacies pay the WAC price for 10:01:21
13 prescription drugs? 10:01:24
14  A. No. 10:01:26
15  Q. Do wholesalers pay the WAC price for 10:01:27
16 prescription drugs? 10:01:29
17  A. As far as I know, they do. 10:01:31
18  Q. They don't get any discounts off the 10:01:36
19 WAC price? 10:01:39
20  A. They might. 10:01:40
21  Q. You also say in that sentence we've 10:01:52
22 been looking at that Prilosec OTC's price is 10:01:54
23 specifically designed to capture market share 10:01:58
24 that otherwise would have been ceded to the 10:02:00

Page 53

1 generics. 10:02:05
2  What's your basis for that statement? 10:02:05
3  A. The work I have done on this case. 10:02:07
4  Q. Any other basis? 10:02:15
5  A. Well, to expand on that previous 10:02:19
6 answer, AstraZeneca chose to release an 10:02:28
7 over-the-counter formulation with the same name 10:02:35
8 as Prilosec, which means there was an effort to 10:02:38
9 build on the brand equity in Prilosec that had 10:02:43
10 been achieved, the price at which Prilosec OTC 10:02:47
11 was made available was well under the price of 10:02:58
12 other products in the market at the time; I view 10:03:02
13 that as an effort to build on the Prilosec brand 10:03:08
14 equity at the expense of the generics, among 10:03:11
15 other things. 10:03:17
16  Q. Are you aware of any AstraZeneca 10:03:21
17 documents that state that Prilosec OTC's price 10:03:25
18 was specifically designed to capture market share 10:03:29
19 that otherwise would have been ceded to the 10:03:32
20 generics? 10:03:34
21  A. Not as I sit here. 10:03:34
22  Q. Are you aware of any testimony from 10:03:36
23 AstraZeneca witnesses that support the 10:03:39
24 proposition that Prilosec OTC's price was 10:03:43

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO COURT ORDER

Page 62

1  Q.  The heading of the chart is comparison           10:23:13
2  of PPIs post OTC; is that right?                     10:23:14
3  A.  It is.                                           10:23:22
4  Q.  And August would have been the last              10:23:23
5  full month before the launch of Prilosec OTC;        10:23:24
6  correct?                                             10:23:27
7  A.  That's fair.                                     10:23:28
8  Q.  So would you agree, then, that on an             10:23:29
9  absolute basis, understanding again your trend       10:23:32
10 line point, that new prescriptions for Nexium        10:23:35
11 increased in the period between the launch of        10:23:39
12 Prilosec OTC and November 2003?                      10:23:42
13 A.  I'm fine with that.                              10:23:54
14 Q.  If I could have you take a look back at          10:23:56
15 your report, which is the one that's been marked     10:23:58
16 as Exhibit 1, and in particular paragraph 22, and    10:24:00
17 in the last sentence you say that the pharmacy       10:24:12
18 log data Dr. Rausser relied upon were specific to    10:24:16
19 California and Massachusetts and therefore not       10:24:20
20 representative of the United States as a whole.      10:24:23
21     Do you see that?                                 10:24:25
22 A.  I do.                                            10:24:26
23 Q.  And what's your basis for that                   10:24:27
24 statement?                                           10:24:28

Page 63

1  A.  He's relying only on data from two               10:24:31
2  states and making inferences about behavior          10:24:35
3  throughout all 50 states, he hadn't made a           10:24:40
4  showing that it's proper to make such inferences.    10:24:47
5  Q.  Any other basis for that statement?              10:24:56
6  A.  Yes.                                             10:24:59
7     I think I address this further on in my           10:25:05
8  report, but Dr. Rausser himself identifies a         10:25:09
9  number of issues that he had with the data that      10:25:16
10 he relied on.  The impact of those issues was to     10:25:18
11 further reduce the database of usable information    10:25:26
12 for him.                                             10:25:34
13     What that ultimately means is that his           10:25:38
14 sample is even narrower than what began as a         10:25:43
15 sample of data for California and Massachusetts      10:25:49
16 for a particular time period and from that very      10:25:53
17 narrow sample he's making inferences about the       10:25:58
18 United States as a whole, which I don't believe      10:26:01
19 he can justifiably make.                             10:26:05
20 Q.  And is there any other basis for your            10:26:09
21 statement that the data he relied on was not         10:26:11
22 representative of the United States as a whole?      10:26:14
23 A.  No.                                              10:26:16
24 Q.  Have you done any analysis to determine          10:26:17

Page 64

1  whether the results Dr. Rausser identified would    10:26:20
2  have been materially different in other states?     10:26:27
3  A.  I have not.                                     10:26:30
4  Q.  Why not?                                        10:26:32
5  A.  That really wasn't my assignment.               10:26:35
6  Q.  If you can look at paragraph 23 for me          10:26:43
7  of your report, in the third sentence you say       10:26:49
8  "Dr. Rausser has not provided details regarding     10:26:54
9  the characteristics of his sample."                 10:26:56
10     What details do you contend Dr. Rausser         10:26:59
11 hasn't provided?                                    10:27:03
12 A.  Well, since he's making inferences              10:27:09
13 about pricing throughout the United States the      10:27:11
14 details would have included information about the   10:27:16
15 representative nature of his sample relative to     10:27:24
16 the United States as a whole; as far as I know,     10:27:29
17 he has not provided that information.               10:27:33
18 Q.  Any other details that you contend he           10:27:36
19 hasn't provided?                                    10:27:41
20 A.  No.                                             10:27:42
21 Q.  In the next sentence you say "It is             10:27:47
22 inappropriate to make inferences about the          10:27:51
23 relative price of Nexium and omeprazole in the      10:27:52
24 United States based on a sample that has not been   10:27:57

Page 65

1  shown to be large enough or representative of the   10:27:59
2  population it purports to represent."               10:28:01
3     Is your basis for that sentence as you           10:28:06
4  just described?                                     10:28:08
5  A.  Yes, sir.                                       10:28:09
6  Q.  In your opinion how large would the             10:28:15
7  sample have to be in order for one to draw          10:28:17
8  inferences about the relative prices of Nexium      10:28:20
9  and omeprazole in the United States?                10:28:23
10 A.  I can't say, I don't know, but I don't          10:28:26
11 believe he's provided information on that           10:28:31
12 question.                                           10:28:33
13 Q.  And you haven't done any analysis to            10:28:35
14 determine what the sample size should be?           10:28:37
15 A.  That's correct.                                 10:28:39
16 Q.  So is it the case that you are not              10:28:41
17 saying the sample size is necessarily too small     10:28:57
18 but that Dr. Rausser hasn't explained why it's      10:28:59
19 large enough?                                       10:29:04
20 A.  Well, that's true, but it's also                10:29:05
21 correct that he himself notes that his sample is    10:29:09
22 not representative of behaviors throughout the      10:29:17
23 United States.                                      10:29:22
24 Q.  If I could have you take a look at              10:29:32

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO COURT ORDER

Page 66

1 paragraph 25 for me, please, which is on page 12  10:29:34
2 of your report, in the second sentence you say  10:29:39
3 "Mail order accounts for a significant portion of  10:29:48
4 the market and an analysis that does not consider  10:29:51
5 this segment is incomplete."  10:29:56
6     What's the market you're talking about  10:30:00
7 in that sentence?  10:30:03
8   A.  Well, actually both the PPI market and  10:30:04
9 generally with respect to prescription  10:30:08
10 pharmaceuticals.  10:30:11
11   Q.  And what's your basis for asserting  10:30:21
12 that mail order accounts for a significant  10:30:23
13 portion of the PPI market?  10:30:25
14   A.  Footnote 28 references mail order  10:30:38
15 generally, it's not specific to PPIs.  10:30:48
16     As I sit here, I'm not certain what I  10:30:56
17 have seen with respect to the PPI market in mail  10:30:59
18 order.  I do believe I saw some documents from  10:31:02
19 Dr. Rausser's workpapers that referenced that.  10:31:05
20   Q.  But as you sit here today you can't  10:31:11
21 point to a specific document that shows, that  10:31:14
22 demonstrates the significance of mail order for  10:31:18
23 the PPI market?  10:31:20
24   A.  I suppose we'd need to check the  10:31:34

Page 67

1 deposition testimony of Kenneth Graham which is  10:31:38
2 referenced in the subsequent two sentences.  10:31:41
3   Q.  Other than potentially the Graham  10:31:48
4 testimony and perhaps workpapers that Dr. Rausser  10:31:50
5 cited, do you have any other basis for the  10:31:55
6 assertion that mail order accounts for a  10:31:59
7 significant portion of the PPI market?  10:32:01
8   A.  No.  10:32:04
9   Q.  Now, for the prescription drug market  10:32:06
10 generally, what's your basis for the statement  10:32:09
11 that mail order accounts for a significant  10:32:11
12 portion of it?  10:32:13
13   A.  Footnote 28 as well as my general  10:32:14
14 understanding of the prescription drug market.  10:32:20
15   Q.  And what's your basis for the statement  10:32:27
16 that an analysis that does not consider this  10:32:31
17 segment being the mail order segment is  10:32:35
18 incomplete?  10:32:37
19   A.  I believe that sentence to be correct.  10:32:39
20 According to footnote 28, in 2003 mail order  10:32:47
21 pharmacies accounted for 13 percent of  10:32:50
22 prescription drug sales, that's a significant  10:32:53
23 portion of the market that one would not want to  10:32:55
24 ignore.  10:32:59

Page 68

1   Q.  And 2003 is the year of the  10:33:10
2 hypothetical negotiation between AstraZeneca and  10:33:11
3 Apotex; correct?  10:33:13
4   A.  Correct.  10:33:14
5   Q.  And on what do you base your opinion  10:33:16
6 that a channel representing 13 percent of  10:33:20
7 prescription drugs sales is significant?  10:33:23
8   A.  13 percent is a significant number.  10:33:26
9   Q.  And is there, in your opinion, a  10:33:30
10 threshold percentage for significance?  10:33:33
11   A.  No, it depends on the nature of the  10:33:35
12 investigation, but in this context 13 percent is  10:33:43
13 significant.  10:33:46
14   Q.  Would 10 percent be significant?  10:33:49
15   A.  In this context, yes.  10:33:51
16   Q.  Nine?  10:33:55
17   A.  Probably would still be significant.  10:33:55
18   Q.  Eight?  10:33:57
19   A.  I don't think I'd want to go beyond  10:34:01
20 nine or 10, but it's clear that mail order was  10:34:04
21 significant back in 2003 and it's become even  10:34:12
22 more significant over time.  10:34:16
23   Q.  But you wouldn't want to go any lower  10:34:21
24 than nine or 10 percent for the significance  10:34:23

Page 69

1 threshold; is that right?  10:34:26
2   A.  In this context I'd probably stop  10:34:28
3 there.  10:34:39
4     (Weinstein Exhibit 8, two-page article  10:34:59
5 entitled "How Mail-Order Pharmacy Gained in  10:35:30
6 Market Share in 2003," marked for  10:35:35
7 identification, as of this date.)  10:35:20
8   Q.  Mr. Weinstein, the document that's been  10:35:20
9 marked as Exhibit 8 before you is an article  10:35:25
10 entitled "How Mail-Order Pharmacy Gained in  10:35:30
11 Market Share in 2003."  10:35:35
12     Is this the article that you cite in  10:35:46
13 footnote 28 of your report?  10:35:48
14   A.  Yes.  10:35:50
15   Q.  And the article is dated March 22,  10:36:02
16 2004; is that right?  10:36:05
17   A.  Correct.  10:36:06
18   Q.  And that's after the date of the  10:36:06
19 hypothetical negotiation; is that right?  10:36:08
20   A.  Also correct.  10:36:10
21   Q.  In the fourth paragraph is where it  10:36:15
22 says that mail order represented 13.2 percent of  10:36:20
23 prescription drug sales in 2003; is that right?  10:36:25
24   A.  Correct.  10:36:29

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO COURT ORDER

Page 70

1  Q.  If you look at the first paragraph of                10:36:31
2  this article it notes that that figure was up 15         10:36:41
3  percent from the previous year; is that right?           10:36:44
4  A.  Correct.                                             10:36:46
5  Q.  So mail order sales were lower than 13               10:36:47
6  percent in 2002; is that right?                          10:36:50
7  A.  I think that statement is probably true              10:36:54
8  although it doesn't necessarily follow directly          10:37:10
9  from what you've asked me to look at, but I think        10:37:12
10 the statement is probably true nonetheless.              10:37:15
11 Q.  If you could look at the second                      10:37:26
12 paragraph, the first sentence there indicates            10:37:28
13 that in 2003 retail sales comprised a little             10:37:29
14 under 60 percent of prescription drug sales; is          10:37:35
15 that right?                                              10:37:39
16 A.  Correct.                                             10:37:51
17 Q.  And Dr. Rausser's analysis was based on              10:37:52
18 retail sales; is that right?                             10:37:54
19 A.  Yes.                                                 10:37:56
20 Q.  If I could have you take a look back at              10:38:05
21 the document that we marked as Exhibit 7 --              10:38:07
22 actually, let's skip that.                               10:38:22
23     Let's look back at your report, Exhibit              10:38:24
24 1, paragraph 25, in the third sentence you say           10:38:30

Page 71

1  that the mail order business is significant in           10:38:40
2  this case because mail order businesses can be           10:38:42
3  highly cost sensitive and can exercise a high            10:38:45
4  level of control over their formulary status.            10:38:48
5     What's your basis for that statement?                 10:38:57
6  A.  The deposition of Kenneth Graham.                    10:38:59
7  Q.  Anything else?                                       10:39:02
8  A.  The sentence is consistent with my                   10:39:10
9  general understanding.                                   10:39:15
10 Q.  Anything else?                                       10:39:21
11 A.  No.                                                  10:39:22
12 Q.  The next sentence says Nexium was at a               10:39:24
13 disadvantage among such payers because                   10:39:27
14 AstraZeneca generally chose not to compete on            10:39:31
15 price.                                                   10:39:35
16    What's your basis for that statement?                 10:39:35
17 A.  It's -- the deposition of Kenneth                    10:39:39
18 Graham.  The basis also includes other                   10:39:46
19 AstraZeneca documents I've seen about Nexium             10:39:50
20 where the strategy described was to maintain what        10:39:53
21 was referred to as the price integrity of Nexium,        10:40:00
22 in other words, to hold the price up to the              10:40:04
23 extent possible.                                         10:40:06
24 Q.  Any other basis?                                     10:40:11

Page 72

1  A.  No.                                                  10:40:12
2  Q.  In that sentence what payers are you                 10:40:23
3  talking about?                                           10:40:27
4  A.  Third-party payers.                                  10:40:34
5  Q.  All third-party payers?                              10:40:38
6  A.  In that context, yes.                                10:40:42
7  Q.  So Nexium was at a disadvantage among                10:40:44
8  all third-party payers because AstraZeneca chose         10:40:48
9  not to compete on price?                                 10:40:52
10 A.  Other things being equal, that's true.               10:40:53
11 Q.  If you could look at the next sentence,              10:41:21
12 "By excluding this segment of the market from his        10:41:24
13 analysis Dr. Rausser's results paint an                  10:41:27
14 incomplete picture of the PPI market," what's            10:41:29
15 your basis for that statement?                           10:41:34
16 A.  I think we went over that previously.                10:41:35
17 Q.  That mail order is, in your view, a                  10:41:38
18 significant portion of the market?                       10:41:41
19 A.  Yes.                                                 10:41:42
20 Q.  Is it your opinion that Dr. Rausser                  10:41:54
21 needed to include every channel for drug sales in        10:41:55
22 his analysis?                                            10:41:57
23 A.  I think he should have looked more                   10:42:03
24 closely at mail order.                                   10:42:06

Page 73

1  Q.  Are there any other channels that you                10:42:14
2  contend he should have included in his analysis?         10:42:19
3  A.  Not necessarily, but as can be seen                  10:42:24
4  from my report, I thought that his sample size,          10:42:32
5  the data he actually used was too thin to make           10:42:39
6  inferences about pricing throughout the United           10:42:43
7  States as a whole.                                       10:42:45
8  Q.  But in terms of channels beyond mail                 10:42:46
9  order, there are not others that you contend             10:42:50
10 Dr. Rausser should have included in his analysis;        10:42:53
11 is that right?                                           10:42:56
12 A.  That's fair.                                         10:42:56
13 Q.  In the next sentence you state that if               10:43:00
14 the mail order segment of the market had been            10:43:02
15 included in his analysis the cost of generic             10:43:05
16 omeprazole therapy would have been found to be           10:43:08
17 lower than Dr. Rausser finds it to be.                   10:43:10
18    What's your basis for that statement?                 10:43:14
19 A.  The basis for that statement is that                 10:43:17
20 mail order is a very price-competitive segment of        10:43:19
21 the market, so given that the strategy that              10:43:25
22 AstraZeneca had embarked upon was to maintain the        10:43:33
23 price integrity of Nexium including mail order           10:43:37
24 would have, at a minimum, narrowed the gap               10:43:43

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO COURT ORDER

Page 78

1  of those rebates is one method of competing on   10:49:10
2  price?   10:49:15
3     A.  Correct.   10:49:15
4     Q.  So it's not the case that AstraZeneca   10:49:18
5  was never willing to compete on price with   10:49:22
6  respect to Nexium; is that right?   10:49:24
7     A.  That's correct.   10:49:27
8     Q.  If I could have you take a look at   10:49:30
9  paragraph 26 of your declaration, please, you   10:49:32
10 begin that sentence by referring to inherent   10:49:39
11 limitations.   10:49:43
12      What do you mean by inherent   10:49:44
13 limitations?   10:49:46
14    A.  Those are the -- in that context those   10:49:46
15 are the limitations that Dr. Rausser described   10:49:49
16 with respect to this data.   10:49:51
17    Q.  That's the limitations of the pharmacy   10:49:57
18 log data that Dr. Rausser described; is that   10:50:00
19 right?   10:50:02
20    A.  Yes.   10:50:02
21    Q.  If I could have you take a look at   10:50:08
22 paragraph 31, please, which is on page 15, you   10:50:10
23 refer to Dr. Rausser trimming his sample to 20   10:50:17
24 payers that purchased the most Nexium, and then   10:50:21

Page 79

1  you say this modification alters the   10:50:24
2  characteristics of the sample and further calls   10:50:27
3  into question its use in making inferences about   10:50:28
4  pricing across the United States as a whole.   10:50:31
5       What is the point you are getting at   10:50:34
6  with that comment?   10:50:36
7     A.  I had hoped it was self-explanatory.   10:50:44
8     Q.  I'm a little slow.   10:50:52
9     A.  I don't think so.   10:50:54
10      The point I was trying to make is that   10:50:56
11 having started from a -- having started with a   10:51:01
12 thin sample, as I've used that term, with   10:51:05
13 inherent limitations with respect to data   10:51:11
14 problems and representativeness of his sample as   10:51:16
15 characterized by Dr. Rausser, he then made a   10:51:20
16 further adjustment to reduce the size of his   10:51:30
17 sample to those payers that purchased the most   10:51:33
18 Nexium, that's his language, and so what that   10:51:36
19 does is it modifies the sample characteristics in   10:51:42
20 that it eliminates payers who did not purchase   10:51:50
21 the most Nexium.   10:51:54
22    Q.  And if you look at footnote 37 which   10:52:02
23 comes off of the sentence we were just   10:52:05
24 discussing, you say "For example, it could be the   10:52:07

Page 80

1  case that third-party payers who purchased the   10:52:09
2  most Nexium were able to negotiate the lowest   10:52:13
3  price for Nexium."   10:52:17
4       Do you see that?   10:52:19
5     A.  I do.   10:52:20
6     Q.  And you're talking about there rebate   10:52:21
7  agreements that AstraZeneca would have with   10:52:23
8  payers concerning Nexium; is that right?   10:52:25
9     A.  Yes, sir.   10:52:27
10    Q.  And would you agree that it would be   10:52:28
11 reasonable for AstraZeneca to be most concerned   10:52:30
12 with payers that had the most Nexium sales and   10:52:34
13 payers with whom it had existing rebate   10:52:41
14 agreements?   10:52:44
15    A.  Most concerned in what sense?   10:52:48
16    Q.  Most concerned in the sense of worry   10:52:51
17 that actions in the market would negatively   10:52:54
18 impact relationships with payers.   10:52:58
19    A.  Thank you.   10:53:04
20      Yes, I would agree with that.   10:53:05
21    Q.  If you could look at paragraph 34 for   10:53:11
22 me, please, it says "Thus, by the time   10:53:13
23 Dr. Rausser performed his analysis the 30   10:53:19
24 pharmacy locations in the original sample had   10:53:23

Page 81

1  been reduced to nine unique third-party payers in   10:53:25
2  California and Massachusetts."   10:53:29
3       What's your basis for that statement?   10:53:34
4     A.  Well, in trying to understand what   10:53:36
5  Dr. Rausser had done in working with his pharmacy   10:53:42
6  logs, that seemed to me to be where he wound up;   10:53:45
7  that is, he started with 30 and based on my   10:53:54
8  review it appeared that he wound up with nine   10:53:57
9  unique third-party payers.   10:54:02
10    Q.  And the 30 is pharmacies; right?   10:54:04
11    A.  Correct.   10:54:07
12    Q.  He maintained 30 pharmacies throughout   10:54:08
13 the analysis; is that right?   10:54:10
14    A.  As far as I know.   10:54:12
15    Q.  But he limited the universe, in your   10:54:14
16 view, to nine third-party payers; is that right?   10:54:15
17    A.  That's the way it appeared to me to be,   10:54:19
18 yes.   10:54:21
19    Q.  If I could have you take a look at   10:54:22
20 Exhibit 2, which is Dr. Rausser's declaration,   10:54:25
21 please.   10:54:27
22    A.  I have it.   10:54:27
23    Q.  Pages 26 and 27 and in particular   10:54:30
24 figures 11 and 12.   10:54:37

21 (Pages 78 - 81)

Page 222

```
 1   Q.  I missed one between 169 and 135.      15:18:31
 2   A.  158, which I had identified previously, 15:18:38
 3  and 157.                                    15:18:40
 4   Q.  And for 158 and 161 you said they might 15:18:57
 5  include reasonable royalty analysis, but you are 15:19:02
 6  not sure; is that right?                    15:19:03
 7   A.  I'm not certain. I think they did, but 15:19:06
 8  I'm not certain.                            15:19:09
 9   Q.  And 158 is Pharmacia Corp. versus Par  15:19:09
10  Pharmaceutical and there you represented Par; is 15:19:17
11  that right?                                 15:19:17
12   A.  Correct.                               15:19:19
13   Q.  Do you recall what the product was     15:19:20
14  there?                                      15:19:21
15   A.  I don't.                               15:19:21
16   Q.  Do you recall the nature of your       15:19:30
17  reasonable royalty analysis?                15:19:32
18   A.  I don't.                               15:19:33
19   Q.  And then in 161, Tristrata Technology  15:19:37
20  versus ICN Pharmaceuticals, you represented ICN 15:19:41
21  there; is that correct?                     15:19:44
22   A.  Correct.                               15:19:46
23   Q.  Do you recall the product there?       15:19:46
24   A.  No.                                    15:19:47
```

Page 223

```
 1   Q.  And do you recall the nature of your    15:19:49
 2  reasonable royalty analysis?                 15:19:51
 3   A.  I don't.                                15:19:52
 4   Q.  Besides the opinions that are reflected 15:20:12
 5  in your report in this case and the things that 15:20:16
 6  we've talked about here in the deposition today 15:20:20
 7  have you formed any other opinions related to 15:20:24
 8  this case that you intend to present at the trial 15:20:26
 9  in this matter?                              15:20:28
10   A.  No.                                     15:20:30
11       MR. ANDERSON: I think that's all I     15:20:34
12  have.                                        15:20:36
13       MS. KINBURN: Nothing from me.          15:20:36
14       THE VIDEOGRAPHER: This is the end of   15:20:38
15  today's deposition. The time is 3:20. We    15:20:39
16  are off the record.                          15:20:42
17       (Time noted: 3:20 p.m.)                 15:20:44
18            _____
19            ROY WEINSTEIN
20
21  Subscribed and sworn to before me
22  this ___ day of _____, 2013.
23
24  _____
```

Page 224

```
 1              C E R T I F I C A T E
 2  STATE OF NEW YORK    )
 3                       : ss.
 4  COUNTY OF NEW YORK   )
 5
 6       I, CARY N. BIGELOW, Court Reporter,
 7  a Notary Public within and for the State of
 8  New York, do hereby certify:
 9       That ROY WEINSTEIN, the witness whose
10  testimony is hereinbefore set forth, was
11  duly sworn by me and that such testimony
12  given by the witness was taken down
13  stenographically by me and then
14  transcribed.
15       I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I am
18  in no way interested in the outcome of this
19  matter.
20       IN WITNESS WHEREOF, I have hereunto
21  set my hand this 20th day of August, 2013.
22
23            _____
24            CARY N. BIGELOW
```

Page 225

```
 1  ------------------ I N D E X ------------------
 2  WITNESS         EXAMINATION BY        PAGE
 3  ROY WEINSTEIN   MR. ANDERSON           5
 4
 5  ------------------ EXHIBITS ------------------
 6  Weinstein Exhibit 1, rebuttal expert    12
 7  report of Roy Weinstein
 8  Weinstein Exhibit 2, declaration of     12
 9  Gordon Rausser Ph.D.
10  Weinstein Exhibit 3, declaration of     13
11  Robert P. Navarro, Pharm.D.
12  Weinstein Exhibit 4, expert report of   13
13  Dr. Christine S. Meyer, Ph.D.
14  Weinstein Exhibit 5, documents bearing  33
15  production Nos. AZD 187346 through AZD
16  187372
17  Weinstein Exhibit 6, documents bearing  34
18  production Nos. AZD 186728 through AZD
19  186780
20  Weinstein Exhibit 7, documents bearing  59
21  production Nos. AZD 199328 through AZD
22  199358
23  Weinstein Exhibit 8, two-page article   69
24  entitled "How Mail-Order Pharmacy
```